534 F.Supp. 832 (1982)
RAILWAY LABOR EXECUTIVES' ASSOCIATION, Plaintiff,
v.
SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Defendant,
and
Consolidated Rail Corporation, Rule 19 Party.
Civ. A. No. 81-8.
Special Court, Regional Rail Reorganization Act.
January 27, 1982.
*833 William G. Mahoney, and Clinton J. Miller, III, Highsaw & Mahoney, P. C., Washington, D. C., for plaintiff Railway Labor Executives' Assn.
John Markle, Jr., Robert H. Young, Jr., and Barbara Kritchevsky, Drinker, Biddle & Reath, Philadelphia, Pa., for defendant Southeastern Pennsylvania Transp. Authority.
Harry A. Rissetto, and John A. Fraser, III, Morgan, Lewis & Bockius, Washington, D. C., and Hermon M. Wells, Philadelphia, Pa., for Rule 19 Party Consolidated Rail Corp.
J. Paul McGrath, Asst. Atty. Gen., Mark C. Rutzick and Christine Nicholson, Attys., Dept. of Justice, Civ. Div., Washington, D. C., for United States as amicus curiae.
*834 Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.
FRIENDLY, Presiding Judge:
This is an action of which we have jurisdiction under § 1152(a) of the Northeast Rail Service Act of 1981 (NRSA) which grants this court original and exclusive jurisdiction over any civil action "for injunctive, declaratory or other relief relating to the enforcement, operation, execution, or interpretation of any provision or amendment" made by it.[1] Section 1136 of that Act provided that:
Notwithstanding any other provision of law or contract, Conrail shall be relieved of any legal obligation to operate commuter service on January 1, 1983.
At issue here is whether Southeastern Pennsylvania Transportation Authority (SEPTA) is subject to the obligations imposed by § 1145 of NRSA with respect to employees of Consolidated Rail Corporation (Conrail) on certain commuter lines in the Philadelphia, Pa., area of which it had acquired the track and rolling stock in 1976 and 1979 pursuant to § 206 of the Regional Rail Reorganization Act (RRRA) for a total payment of approximately $10.2 million. While the case initially centered on SEPTA's decision to begin operations on a 15.2 mile line between Fox Chase and Newtown, Pa., without complying with the procedures of § 1145, which it claims to be inapplicable on both statutory and constitutional grounds, the scope of the case was broadened after SEPTA's announcement that it intends early in 1982 to follow a similar course with respect to all the commuter services which it conducts out of the Reading Terminal in Philadelphia center city.

I. The History of the Dispute

Plaintiff Railway Labor Executives' Association (RLEA) is an unincorporated association comprising the chief executive officers of a number of standard national and international railway labor unions in the United States, including many having collective bargaining agreements with Conrail, which were negotiated in accordance with the Railway Labor Act, 45 U.S.C. § 151 et seq., and the RRRA, 45 U.S.C. § 771 et seq.
SEPTA is a corporation organized under the Pennsylvania Urban Mass Transportation Law, Act of January 22, 1968, P.L. 42, No. 8, as amended by the Act of July 10, 1980, P.L. 427, No. 101, 55 P.S. § 600.101 et seq., to "exercise the public powers of the Commonwealth as an agency and instrumentality thereof", id. § 600.303(a). It, and its predecessors, have long furnished a variety of passenger services in the Philadelphia area by buses, trolleys, subways and elevated railroads; its employees are also represented by unions under collective bargaining agreements negotiated pursuant to Pennsylvania's Public Employee Relations Act, Act of July 23, 1970, P.L. 563, No. 195, 43 P.S. § 1101.101 et seq. SEPTA is one of the "commuter authorities" expressly mentioned in the definition section of NRSA, § 1135(a)(3). Conrail, which was organized pursuant to § 301 of RRRA, carries property for hire in interstate commerce under the Interstate Commerce Act, 49 U.S.C. § 1 et seq., and operates commuter rail service when subsidized by state or local governments pursuant to RRRA.
Before April 1, 1976, SEPTA subsidized commuter rail service on 13 lines radiating from center city Philadelphia operated by the Reading and Penn Central railroads and later by their reorganization trustees, serving the five southeastern Pennsylvania counties of Bucks, Chester, Delaware, Montgomery and Philadelphia.[2] Since the transfer of these properties to Conrail on April 1, 1976, Conrail has continued to operate the commuter service formerly furnished by the transferors and has received financial assistance from SEPTA as provided in § 304(e) of RRRA.
*835 The difficulties giving rise to this action began when SEPTA determined in late 1980 that the rail diesel car (RDC) portion of the commuter service being provided by Conrail was too costly and should be discontinued. In April 1981 SEPTA made to Conrail its offer of financial assistance for the period July 1, 1981June 30, 1982. This included elimination of all RDC service including that between Fox Chase and Newtown. Conrail regarded the subsidy offer as insufficient and on June 26, 1981, posted notices pursuant to § 304 of the RRRA that it would cease to operate commuter rail service on August 30, 1981. On August 11 SEPTA offered to provide approximately $25 million in subsidy to cover Conrail's operation of non-diesel service from July 1 through December 31, 1981. Conrail accepted this on August 20.[3] We were told at argument that the contract has been further extended to March 31, 1982.
On June 29, 1981, Conrail issued a bulletin that service between Fox Chase and Newtown would cease at 12:01 A.M. on July 1. SEPTA then began a program to repair that line and accommodated passengers by providing bus service between stations on the Fox Chase-Newtown segment and an adjacent line. On October 5, 1981, SEPTA commenced what it terms "high-speed passenger service" on the Fox Chase-Newtown segment.[4] This was operated by SEPTA employees, who are members of the Transport Workers Union; none of the Conrail employees who had previously operated the segment were transferred to SEPTA.
Before the commencement of SEPTA's Fox Chase-Newtown service RLEA brought this action against SEPTA and joined Conrail as a party under F.R.Civ.P. 19. The complaint sought a declaratory judgment that under § 508, which § 1145 of NRSA added to the Rail Passenger Service Act, SEPTA was required to negotiate and arbitrate if necessary an implementing agreement with Conrail and the labor organizations representing Conrail employees to be transferred to SEPTA incident to the Fox Chase-Newtown operation. A temporary restraining order and preliminary and permanent injunctive relief were also sought.
After hearing argument on October 5, 1981, this court denied the request for a temporary restraining order. We also directed that the motion for a preliminary injunction be considered together with a trial on the merits pursuant to F.R.Civ.P. 65(a)(2) and urged the parties to enter into a stipulation of facts. They entered into such a stipulation, accompanied by numerous exhibits; as a result of certain questions raised at oral argument they have supplemented their stipulation. Since the argument on the temporary restraining order had indicated that the dispute over the Fox Chase-Newtown segment might be only a small part of a much larger controversy that would be precipitated when SEPTA implemented its decision to operate all commuter service out of the Reading Terminal early in 1982 with its own employees and others to be recruited and not to enter into any negotiations with respect to the transfer of Conrail employees, we suggested that RLEA amend its complaint so that the broader as well as the smaller issue might be before us. RLEA did this; the amended complaint further alleged that SEPTA was and would be in violation of § 510, also added to the Rail Passenger Service Act by § 1145 of NRSA. Since one of SEPTA's contentions was that if RLEA's construction of the statute was correct, §§ 508 and 510 would be unconstitutional *836 under National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), we certified to the Attorney General, pursuant to 28 U.S.C. § 2403(a), that the constitutionality of an act of Congress had been drawn into question. The United States thereupon moved for and was granted leave to participate as amicus curiae. Its brief is limited to the constitutional question and urges that National League of Cities is inapplicable. Conrail's main brief concerns itself only with the question of statutory construction and essentially supports the position of RLEA. We heard argument on December 21, 1981.

II. Statutory Setting

In order to understand the problem of statutory construction posed by this action it is necessary to place the new sections 508 and 510 of the Rail Passenger Service Act in their setting. As stated at the outset, § 1136 of NRSA relieves Conrail of any legal obligation to operate commuter service on January 1, 1983. Section 1137 of NRSA adds a number of new sections to the Rail Passenger Service Act. Section 501 provides for the establishment no later than November 1, 1981, of a wholly-owned subsidiary of Amtrak to be known as Amtrak Commuter Services Corporation (Amtrak Commuter). This was to be "a contract operator of commuter service on behalf of the commuter authorities that contract with" it for such operation; it was to "have no common carrier obligation to operate either passenger or freight service", § 501(b)(2). Section 504(a) authorizes Amtrak Commuter to operate commuter service under an agreement with a commuter authority. Section 504(b)(1) provides that "Amtrak Commuter shall operate commuter service which Conrail was obligated to provide on the effective date of this title under section 303(b)(2) or 304(e) of the Regional Rail Reorganization Act of 1973, and may operate any other commuter service", if the commuter authority for which service is to be operated offers to provide a "commuter service operating payment" as there defined. Section 504(g) instructs:
Notwithstanding any other provision of this section, Amtrak Commuter is not obligated to provide commuter service if a commuter authority operates the service itself or contracts for the provision of such service by an operator other than Amtrak Commuter. In any such case, Amtrak Commuter shall, where appropriate, provide the commuter authority or such other operator with access to the rail properties needed to operate such service.
The process is further described in § 506 entitled "Property Transfer". This begins by directing, § 506(a), that
Not later than April 1, 1982, each commuter authority shall notify Amtrak Commuter and Conrail whether it intends to operate its own commuter service or to contract with Amtrak Commuter for the operation of such service.
Section 506(b) directs that "(1) A commuter authority may initiate negotiations with Conrail for the transfer of commuter services operated by Conrail" and that such an agreement shall specify at least the service responsibilities to be transferred, the rail properties to be conveyed, and a transfer date not later than January 1, 1983. Any such transfer agreement shall be entered into not later than September 1, 1982, § 506(b)(3). Section 506(c) provides:
(c) Not later than September 1, 1982, Conrail and Amtrak Commuter shall agree on terms and conditions for the transfer to Amtrak Commuter of all of Conrail's commuter service in the Northeast Corridor, except for commuter service to be transferred directly to a commuter authority under an agreement entered into under subsection (b) of this section, and any rail properties used or useful for the operation of such commuter service. Such service and properties shall be transferred to Amtrak Commuter not later than January 1, 1983.
Sections 506(e), (f) and (g) provide:
(c) Following the transfer of commuter service and properties to Amtrak Commuter, and upon the request of any commuter authority for which the service is provided by Amtrak Commuter, Amtrak Commuter and such commuter authority *837 shall agree upon terms and conditions for the transfer to the commuter authority of such service and any rail properties used or useful in the operations of such commuter service.
(f) If, within 90 days after a request for the transfer of commuter services is made by a commuter authority under subsection (e), Amtrak Commuter and such commuter authority do not sign an agreement pursuant to subsection (e) of this section, Amtrak Commuter or the commuter authority may appeal to the Secretary. Upon such appeal the Secretary shall determine which rail properties shall be transferred and the terms and conditions of such transfer.
(g) Consideration for inventory, including tools, spare parts, and fuel, transferred under this section shall be based on book value. The transfer of fixed facilities and rolling stock under this section shall be without consideration.
Section 1139 authorizes an appropriation to the Secretary of Transportation in the fiscal year ending September 30, 1982, not to exceed $50,000,000 "to facilitate the transfer of rail commuter services from Conrail to other operators."
Section 1145 adds to the Rail Passenger Service Act the labor provisions, § 508 and § 510, which are directly involved in this case. These read:
Sec. 508. TRANSFER OF EMPLOYEES.
(a) Not later that May 1, 1981, Conrail, commuter authorities that intend to operate commuter service, and representatives of the various crafts or classes of employees of Conrail to be transferred to the commuter authorities shall enter into negotiations for an implementing agreement in accordance with subsection (c) of this section.
(b) Not later than May 1, 1981, Conrail, Amtrak Commuter, and representatives of the various crafts or classes of employees of Conrail to be transferred to Amtrak Commuter shall enter into negotiations for an implementing agreement in accordance with subsection (c) of this section.
(c) Such negotiations shall
(1) determine the number of employees to be transferred to Amtrak Commuter or a commuter authority;
(2) identify the specific employees of Conrail to whom Amtrak Commuter or a commuter authority offers employment;
(3) determine the procedure by which such employees may elect to accept employment with Amtrak Commuter or a commuter authority;
(4) determine the procedure for acceptance of such employees into employment with Amtrak Commuter or a commuter authority;
(5) determine the procedure for determining the seniority of such employees in their respective crafts or classes in Amtrak Commuter or with a commuter authority which shall, to the extent possible, preserve their prior seniority rights;
(6) ensure that all such employees are transferred to Amtrak Commuter or a commuter authority no later than January 1, 1983; and
(7) ensure the retention of prior seniority on Conrail of employees transferring to Amtrak Commuter or a commuter authority and determine the extent and manner in which such employees shall be permitted to exercise such seniority in order to (A) provide employees transferred to Amtrak Commuter or a commuter authority at least one opportunity every six-month period to exercise previous freight seniority rights, (B) maximize employment opportunities for employees on furlough, (C) maintain the ability to recall experienced employees, (D) ensure that under no circumstances are seniority rights exercised in any manner which results in any disruption of service or a position being filled which would otherwise not be filled under the terms of any crew consist, fireman manning, or other similar agreement, and (E) ensure that Conrail has the right to furlough one employee in the same craft or class for each employee who returns from Amtrak Commuter or a commuter authority by exercising seniority.

*838 (d) (1) If agreements with respect to the matters being negotiated pursuant to this section are not reached by August 1, 1982, the parties to the negotiations shall, within an additional 5 days, select a neutral referee. If the parties are unable to agree upon the selection of such a referee, the National Mediation Board shall immediately appoint a referee.
(2) The referee shall commence hearings on the matters being negotiated pursuant to this section not later than 5 days after the date he is selected or appointed, and shall render a decision within 20 days after the date of commencement of such hearings. All parties may participate in the hearings, but the referee shall have the only vote.
(3) The referee shall resolve and decide all matters in dispute with respect to the negotiation of the implementing agreement or agreements. The referee's decision shall be final and binding to the same extent as an award of an adjustment board under section 3 of the Railway Labor Act, and shall constitute the implementing agreement or agreements between the parties. The National Mediation Board shall fix and pay the compensation of such referees.
(e) If Amtrak Commuter transfers commuter service and properties to a commuter authority under Section 506 of this title, Amtrak Commuter, the commuter authority, and representatives of the various crafts or classes of employees to be transferred to the commuter authority shall enter into an implementing agreement in accordance with subsection (c) of this section. If no agreement is reached by the date service and properties are transferred, the dispute shall be resolved by a neutral referee in accordance with subsection (d) of this section.
(f) Any employee of Conrail who is not offered employment with Amtrak Commuter or a commuter authority under agreements entered into under this section shall be provided employee protection under section 701 of the Regional Rail Reorganization Act of 1973 to the same extent as if such employee had remained in the employ of Conrail.
Sec. 510. COLLECTIVE BARGAINING AGREEMENT FOR AMTRAK COMMUTER OR COMMUTER AUTHORITIES.
(a)(1) Not later than September 1, 1982, the commuter authorities that intend to operate commuter service and the representatives of the various classes or crafts of employees to be transferred to such commuter authorities under agreements entered into under section 508 of this Act shall enter into new collective bargaining agreements with respect to rates of pay, rules, and working conditions.
(2) Not later than September 1, 1982, Amtrak Commuter and the representatives of the various classes or crafts of employees to be transferred to Amtrak Commuter under agreements entered into under section 508 of this Act shall enter into new collective bargaining agreements with respect to rates of pay, rules, and working conditions.
(b) If the parties have not reached an agreement by the date specified in subsection (a) of this section, any party to the dispute or the Governor of any State through which the service that is the subject of the dispute is operated may, within 15 days after such date, request the President to establish an emergency board pursuant to subsection (c) of this section.
(c) Within 15 days after the request under subsection (b) of this section, of a party or a Governor, the President shall create an emergency board. Such board shall conduct a public hearing on the dispute at which each party shall appear and provide testimony, and shall, within 30 days after the date of its creation, report on the dispute.
(d) If no settlement in the dispute is reached within 10 days after the report of the emergency board, such board shall require the parties to the dispute to submit, within 15 days, final offers to the board for settlement of the dispute.
(e) Within 15 days after the submission of final offers, the emergency board shall *839 submit a report to the President setting forth its selection of the most reasonable offer.
(f) If the emergency board selects a final offer submitted by a carrier and the employees of such carrier engage in any work stoppage arising out of the dispute, such employees shall not be eligible during the period of such work stoppage for benefits under the Railroad Unemployment Insurance Act.
(g) If the emergency board selects a final offer submitted by the employees and the carrier refuses to accept such offer, the carrier shall not participate in any benefits of any agreement between carriers which is designed to provide benefits to such carriers during a work stoppage.
(h) The provisions set forth in this section shall be the exclusive means for resolving any dispute relating to entering into an initial collective bargaining agreement between Amtrak Commuter or a commuter authority, as the case may be, and representatives of the various classes or crafts of employees to be transferred to Amtrak Commuter or such commuter authority.
Also relevant are the addition of § 509, reproduced in the margin,[5] and § 1157 of NRSA which amends the Railway Labor Act so as to make it applicable to any dispute subject to that Act between a publicly funded and publicly operated carrier providing rail commuter service (including Amtrak Commuter) and its employees.

III. The Meaning of the Statute

The parties' dispute focuses principally upon a single statutory provision§ 508(a) of NRSA.[6] RLEA and Conrail argue that since SEPTA is a commuter authority "that intend[s] to operate commuter service", the plain language of § 508(a) directs that it "shall enter into negotiations for [a labor transfer] implementing agreement". If an agreement cannot be reached, § 508(d) subjects the parties to binding arbitration to determine, inter alia, "the number of [Conrail] employees to be transferred to" SEPTA, "the specific employees of Conrail to whom [SEPTA] offers employment", and "the procedure for determining the seniority" of employees transferred to SEPTA. SEPTA replies that § 508(a) was not intended to be mandatory and that it is free to ignore NRSA's labor transfer provisions and to hire whomever it desires to man the commuter services it intends to provide.
Before proceeding with a more detailed and critical textual analysis and with a consideration of the legislative history, it will be useful to set forth the positions of the parties with respect to the economics of the situation. Each party insists that an interpretation contrary to its own would have adverse economic consequences which Congress could not have contemplated.
SEPTA contends that the huge deficits experienced in commuter services have been caused in considerable part by the fact that the work, wages and other benefits of the Conrail employees providing those services were governed by a multitude of collective bargaining agreements inherited from Conrail's predecessors which included highly uneconomic work rules. See Northeast Corridor Commuter Rail Authorities Committee (NECCRAC), Report on Conrail Labor Issues, dated May 28, 1981, pp. 22-28. *840 Efforts to obtain relief from these allegedly have been hindered by the absence of any final and binding dispute settlement procedure under the Railway Labor Act. Id. at 34. Moreover Conrail allegedly has shown little interest in seeking changes in its labor agreements to meet the special problems of commuter service. Since these were largely subsidized by commuter authorities, Conrail has concentrated its bargaining efforts on obtaining concessions beneficial to its freight services. Congress could not have intended, so the argument runs, to burden a commuter authority, able and willing to make a fresh start, with these residues of the past; rather Congress meant to allow such an authority to decline to accept transfers of employees from Conrail, make its own decisions as to whom to hire (which, of course, could include Conrail employees preferring to keep at their previous work) and negotiate collective bargaining agreements under state labor laws.
RLEA and Conrail respond that Congress, unwilling itself to weigh such contentions as against the conflicting ones of Conrail, hereafter discussed, directed that such economic considerations be presented to the referee under § 508(d), the factfinding panel under § 509 and the emergency board under § 510. They also point out that under § 510(a)(1) there are to be new collective bargaining agreements, not simply a continuation of the Conrail agreements. SEPTA replies that similar procedures have been attempted in the past but have shattered on the rocks of union intransigence and the threat, or actuality, of a strikea threat which § 510 does not eliminate.
The economic contentions of RLEA and Conrail center upon the severe adverse effects on Conrail of a refusal by commuter authorities to accept the transfer of the Conrail employees who have been operating the services subsidized by the authorities. There were some 10,500 such employees, over 1,700 of whom serve the Philadelphia metropolitan area. Conrail's Vice President-Labor Relations averred in an affidavit attached to its brief that exercise of seniority rights by Conrail employees who would lose their present jobs if SEPTA followed the course here proposed would have a number of untoward results. Some 450 conductors and trainmen would be free to exercise their seniority in freight service. This would displace an equivalent number of other Conrail employees, saddling Conrail with retraining costs and partially frustrating the agreement Conrail had achieved with the United Transportation Union, whereby freight trains may be operated with a conductor and only one trainman rather than two. Displaced engineers and firemen, principally engineers, could move back into similar ranks in freight service and might even be able to demand firemen positions which Conrail can now leave vacant as unneeded. Here also there would be retraining costs. Nonoperating employees could also exercise seniority rights. The bumping of junior employees would result in lowered employee morale and possible labor unrest, and would impose additional burdens on the federally financed employee protection plan authorized under § 701 of the RRRA as amended by § 1143(a) of NRSA.[7] Whereas § 508(c)(7), added to the Rail Passenger Service Act by NRSA, permits Conrail to furlough one employee for every employee who, after being employed by Amtrak Commuter or a commuter authority, exercises seniority rights to return to Conrail, Conrail considers it questionable whether the furlough privilege extends to the case where an employee has never been employed by Amtrak Commuter or a commuter authority. The force of all these considerations would be augmented if other commuter authorities were to follow SEPTA's example.[8]
*841 Although the economic contentions of both sides have force, we think those of RLEA and Conrail outweigh those of SEPTA in pointing to the probable intention of Congress. NRSA was part of the Omnibus Budget Reconciliation Act, the object of which was to save money for the federal government. The primary purpose of NRSA as outlined in §§ 1132 and 1133 was to reduce federal subsidization. This was to be done by making Conrail a profitable carrier or, failing that, to provide for the transfer of its freight operations to private hands. Termination of Conrail's involvement with commuter operations was deemed essential to that goal. It would not seem likely that Congress intended some commuter authorities electing to provide their own commuter services to be able to aggravate Conrail's situation by refusing to employ any of the Conrail employees who have been engaged in services Conrail had continued to provide at their request. Congress would have considered it more reasonable to leave determination of how many such employees should follow the service to be settled by agreement or, failing that, by the decision of a referee.
With this background we proceed to a more detailed examination of the text and to the legislative history. As noted above, the RLEA argument[9] that SEPTA must negotiate with representatives of Conrail employees regarding labor transfer implementing agreements is extremely simple. Section 508(a) provides that "Conrail, commuter authorities that intend to operate commuter service, and [representatives of labor] shall enter into negotiations for an implementing agreement [regarding the transfer of Conrail employees to commuter authorities]." SEPTA has made it abundantly clear that it "intend[s] to operate commuter service" on the lines here at issue. Thus, RLEA argues, SEPTA is within the terms of § 508(a) and, as that section provides, SEPTA "shall enter into [labor transfer] negotiations".
It is difficult to see any basis for disagreeing with RLEA's reading of § 508(a) so long as one focuses solely on that section. The two phrases on which RLEA's argument hangs"commuter authorities that intend to operate commuter service" and "shall negotiate"seem clearly to apply to SEPTA.[10] Moreover, there is nothing in the legislative history that suggests that § 508(a) was intended to mean something other than what it seems to say. Indeed, as discussed below, the legislative history supports RLEA's reading of the section.
In order to avoid the force of RLEA's argument, SEPTA makes several arguments in support of its basic contention that NRSA is not mandatory, and thus that commuter authorities may disregard the labor transfer provisions if they choose. SEPTA relies in the first instance on a somewhat tortured reading of § 508(a). SEPTA points to the language emphasized in the following quotation:
Not later than May 1, 1982, Conrail, commuter authorities that intend to operate commuter service, and representatives of the various crafts or classes of employees of Conrail to be transferred to the commuter authorities shall enter into negotiations for an implementing agreement in accordance with subsection (c) of this section. (Emphasis added.)
SEPTA argues that, "[i]f there are no employees being transferred, obviously negotiations are unnecessary." SEPTA Brief at 24. SEPTA concludes that since it decided *842 that no Conrail employees were "to be transferred" to its Fox Chase-Newtown operations (and that no such transfer is intended for the commuter operations out of Reading Terminal), § 508(a) is inapplicable.
This argumentwhich relies on the premise "if there are no employees being transferred"begs the question of who is to decide how many Conrail employees are "to be transferred". RLEA's whole case is that Congress has set up a procedure to do this, and RLEA can point convincingly to § 508(c)(1), which provides that the negotiating process "shall ... determine the number of employees to be transferred to Amtrak Commuter or a commuter authority". If, as SEPTA claims, it can decide in advance of negotiations that it wants no Conrail employees, then it is hard to see why § 508(c)(1) was included.[11]
Moreover, the phrase "to be transferred" seems addressed to a question entirely different from whether or not § 508(a) requires a commuter authority to negotiate. It makes perfect sense to read the phrase as defining which labor representatives are permitted to enter into labor transfer negotiations: representatives of workers who are used only on freight operations, or other non-commuter operations, are not to be included, because the employees these persons represent are not employees "to be transferred". Once the negotiations under § 508(c)(2)which provides that the labor transfer negotiations are to "identify the specific employees of Conrail" to be transferredare concluded, then representatives of nontransferable employees will be excluded from the negotiations on subjects set forth in §§ 508(c)(3)-(7).
Lastly, the phrase "to be transferred" is also used in § 508(b), which is identical to § 508(a), except for the fact that it applies to the transfer of Conrail employees to Amtrak Commuter, rather than to commuter authorities:
Not later than May 1, 1982, Conrail, Amtrak Commuter, and representatives of the various crafts or classes of employees of Conrail to be transferred to Amtrak Commuter shall enter into negotiations for an implementing agreement in accordance with subsection (c) of this section. (Emphasis added.)
If the phrase "to be transferred" has the effect of permitting SEPTAand other commuter authoritiesto escape from the statutory negotiating process, then it must have a similar effect with respect to Amtrak Commuter. This result would seem extremely peculiar since Amtrak Commuter was established specifically to take over Conrail's commuter servicesa function it is compelled to perform by § 506(c), which provides that "Conrail and Amtrak Commuter shall agree on terms and conditions for the transfer to Amtrak Commuter of all of Conrail's commuter service in the Northeast Corridor except for commuter service to be transferred directly to a commuter authority under an agreement entered into under subsection (b) of this section ..." (emphasis added). Since the phrase "to be transferred" cannot have been meant to give Amtrak Commuter the option of disregarding the statutory procedures established by § 508, it is difficult to argue that the identical phrase, when used a half-dozen lines earlier in the same section, was intended to give commuter authorities such power. For all these reasons, we find SEPTA's reliance on the phrase "to be transferred" unpersuasive.[12]
SEPTA's second, and more powerful, argument starts with the observation that NRSA was not intended to set forth the only avenues by which commuter authorities may assume commuter service responsibilities *843 currently satisfied by Conrail.[13] SEPTA rightly points out that NRSA nowhere says that it sets out an exhaustive list of options from which commuter authorities must choose if they desire to provide commuter services. NRSA deals expressly with only two methods of providing commuter services: (1) a commuter authority may contract with Amtrak Commuter for services previously provided by Conrail under contract with a commuter authority, and (2) a commuter authority may provide such services itself. See § 506(a). SEPTA points out, however, that there are several other possible ways in which a commuter authority might act. It is clear that commuter authorities are not required by the new amendments to provide commuter service to their communities, and thus, that they are free to pursue a course not mentioned in § 506namely, abandonment of their service on a line. Likewise, a commuter service might run trains over lines for which Conrail has never been responsible. Most important, SEPTA argues, a commuter authority might choose to contract with a third party for the operation of trains previously run by Conrail. Indeed, the Massachusetts Bay Transportation Authority for some time has contracted with the Boston & Maine Railroad rather than Conrail. See USRA, Conrail at the Crossroads: The Future of Rail Service in the Northeast, at page 30 n.28 (1981); SEPTA Brief at 21 n.23. Support for the proposition that NRSA was not intended to prohibit such arrangements is indicated by § 504(g), which provides that "Amtrak Commuter is not obligated to provide commuter service if a commuter authority operates the service itself or contracts for the provision of such service by an operator other than Amtrak Commuter".
Since NRSA is not an exhaustive list of the commuter authorities' options, SEPTA argues next that § 508's labor transfer provisions are entirely permissive and that a commuter authority has the freedom to choose whether or not to follow them. The argument contains a fatal flaw. The claim that the Act is permissive rests upon the observation that there are options other than those set forth in the section that commuter authorities are permitted to pursuesuch as abandonment or contracting with a third party, see supra. Based on this observation, SEPTA concludes that even if a commuter authority pursues one of the options set forth in § 506, it may ignore the statutory scheme. This conclusion is not dictated by the premisethat § 506 is not an exclusive list of the options which commuter authorities may pursue. Congress could well have intended that a commuter authority be free to pursue any of a number of alternatives, but that if it chose one of the options dealt with by the statute, then the statutory framework had to be followed. This interpretation of § 508(a) is supported by the language that Congress used in setting forth the labor transfer procedure. As noted earlier, § 508(a) states flatly that "commuter authorities that intend to operate commuter service ... shall enter into negotiations ...." At least on its face this provision, with its use of the mandatory "shall", supports interpreting the Act as directing that once a commuter authority determines to operate its own commuter service, then NRSA's labor transfer procedures are mandatory. Aside from its reading of the phrase "to be transferred", which we rejected above, SEPTA points to no statutory language that suggests that § 508(a)'s flat statement is not mandatory.
*844 This reading of the Act is supported by NRSA's legislative history.[14] Earlier versions of NRSA were significantly different from the provisions now before us. Most importantly, under S. 1100 the labor transfer provisions of the bill were explicitly linked to the provisions of the Act dealing with the transfer of services and property from Conrail to a commuter authority. Put differently, a commuter authority apparently was required to comply with the labor transfer provisions of the bill only if it elected to make use of the Act's property and service transfer provisions. Section 403 of S. 1100 (which was the predecessor of § 508 of NRSA) provided, "If Conrail or Amtrak enters into an agreement for the transfer of commuter service responsibilities to a commuter authority under title II of this Act" (emphasis added) then labor transfer negotiations are required. By its very terms"If" an agreement is entered into under title IIthe labor transfer provision was conditioned upon what occurred under title II. But § 202(a) of title II provided that "[a] commuter authority ... may initiate negotiations with Conrail for the transfer of commuter services operated by Conrail" (emphasis added). Apparently, under the section as it stood in S. 1100, it was up to the commuter authority to decide whether or not an agreement would be entered into under title II. The only other commuter service transfer provision in "title II of the Act" is § 202(d), which deals with transfers from Amtrak to a commuter authority, and which provides, "[f]ollowing the transfer of commuter services and properties to Amtrak and upon the request of the commuter authority ..., Amtrak and the commuter authority shall agree upon terms and conditions for the transfer ...." (Emphasis added.) Again, there is little basis for arguing that a commuter authority must make a request for a commuter service transfer. In short, under title II of S. 1100 commuter authorities apparently were free to seek, or not to seek, property and service transfers from Conrail and Amtrak, and the Act's labor transfer provision, § 403, was linked to the decision of a commuter authority to seek a property transfer under title II. SEPTA's argument that the labor transfer provisions of NRSA are permissive would have found strong support in the language of S. 1100.
The Senate bill which superseded S. 1100the Senate version of the Omnibus Bill, S. 1377made significant changes in S. 1100. Section 412-7 of S. 1377 introduced an entirely new provision, which said:
Not later than 90 days after the date of enactment of this part, each commuter authority shall notify the Secretary and Conrail whether it intends to operate its own commuter service or to contract with Amtrak Commuter for the operation of such service.[15] *845 This language was inserted at the beginning of what was, in S. 1377, § 412-8, and ultimately became § 506(a) of NRSA. The new provision, which, like § 508(a), contains the mandatory "shall", introduced a new, nonpermissive element into the statutory framework. As the Senate report accompanying S. 1377 described the new language: "[t]he section requires that a commuter authority notify the Secretary and Conrail not later than 90 days after enactment if it intends to assume direct control of its commuter operations or if it intends to contract with Amtrak Commuter." S.Rep.No. 139, 97th Cong., 1st Sess. 326, U.S.Code Cong. & Admin.News, pp. ___, ___ (1981) (emphasis added).
At the same time that the forerunner of § 506(a) was added to S. 1377, the predecessor of § 508(a) also made its debut. While the labor transfer provisions of § 403(a) of S. 1100 were linked to the property and service transfer provisions of that version of the bill, see pp. ___-___, supra, in S. 1377 this linkage was removed. Whereas § 403(a) of S. 1100 provided for labor negotiations "[i]f Conrail or Amtrak enter[ed] into an agreement for the transfer of commuter service responsibilities under title II ...", (emphasis added) the new labor transfer provision, § 414-1(a) of S. 1377, provided, "[w]ithin 120 days after the date of enactment of this part, Conrail, commuter authorities that intend to operate commuter service, and representatives of the various crafts or classes [of] employees of Conrail to be transferred to the commuter authorities shall enter into ... negotiations" (emphasis added). This new provision was accepted by the conferees and is now § 508(a) of NRSA.[16]
Despite the absence of specific language in the legislative history saying that S. 1377 was intended to remove the linkage in S. 1100 between the permissive property transfer provisions and the labor transfer provisions, the legislative developments described above strongly suggest that this was what was intended. It appeared on the face of § 403 of S. 1100 that the property and labor transfer provisions were linked, and that a commuter authority could bypass the labor transfer negotiations by foregoing a transfer of property from Conrail.[17] When it accepted S. 1377, however, Congress entirely deleted the language that accomplished this result. In its place, Congress substituted language which not only did not contain the linkage that § 403 had, but added a new phrase that had every appearance of being mandatory: "commuter authorities that intend to operate commuter service ... shall enter into negotiations." The mandatory character of the *846 addition was made even clearer by the report accompanying S. 1377, which described the new section in the following terms: "Subsections (a) and (b) [of § 414-1] require Amtrak Commuter or the commuter authorities, whichever is applicable ... to enter into implementing agreements within 21 [sic] days after enactment of the Act." S.Rep.No. 139, 97th Cong., 1st Sess. 336 (1981) (emphasis added). The language that this portion of the Senate Report refers to now appears, with only technical changes, in § 508(a) of NRSA.
Finally, the conferees seem to have thought they had provided a complete solution to the transfer of labor and property from Conrail to commuter authorities and Amtrak Commuter.[18] They said in the Explanatory Statement, p. 58:
The implementing agreement provided for in new section 508 of the Rail Passenger Service Act is designed to provide for an orderly transfer of employees from Conrail to Amtrak Commuter or the commuter authorities.
This concern with an "orderly transfer" would be difficult to square with SEPTA's interpretation of the statutory scheme wherein commuter authorities which own their tracks and rolling stock, see note 8, supra, are left entirely free to ignore the procedures provided by Congress. With commuter authorities having proclaimed their desire to be free of uneconomic work rules and the need to bargain with the railway craft unions,[19] it would be unlikely for commuter authorities to make use of the statutory framework unless the labor *847 transfer provisions are mandatory.[20] Consequently, NRSA's complex labor transfer provisions might well be largely ignoreda result we do not think Congress intended.
Although, in the light of the closeness of the question and the seriousness of the consequences of our decision, we have deemed it proper to dissect the statute and the legislative history in what may seem tiresome detail, our principal reason for reading §§ 508 and 510 as applicable to a commuter authority which desires to operate commuter service that was operated for it by Conrail on the effective date of Subtitle E is that to uphold SEPTA's contrary argument would defy the basic purpose of the amendments made by §§ 1136-39 and 1143 of NRSA. Broadly speaking these provisions were an affirmative answer to chapter 9 (entitled "Passenger Service") of Conrail's Response (entitled "Options for Conrail") to Section 703(c) of the Staggers Rail Act of 1980. In that response Conrail had asserted, apparently convincingly, that, despite state and local subsidization, commuter services were a serious drain on its resources (p. 9-9). It had also engaged in an elaborate discussion, somewhat similar to that in its brief here, of the adverse economic consequence of any method of relieving it of its commuter service obligations that did not also provide continued employment in that service of the employees who had been rendering it (p. 9-21). Congress did not go to the full extent sought by Conrail on that point. In § 508 it left the determination of what Conrail employees would go with the service in the first instance to the agreement of the parties and, if that proved unattainable, to a referee. In a section showing extraordinary deference to the wishes of the railway unions, it even preserved the rights of transferred Conrail employees to exercise previous freight seniority rights, § 508(c)(7), although this would entail evils of the very sort feared by Conrail,[21] and provided that any employee not transferred should be given employee protection under the Government financed plan established under the new § 701 of RRRA "to the same extent as if such employee had remained in the employ of Conrail", § 508(f). The timetables in the labor provision are carefully constructed so that determination of the Conrail employees to be transferred and the collective bargaining agreements will all be in place by January 1, 1983, when commuter services must be transferred and Conrail is to be relieved of its responsibilities for such service. We cannot readily attribute *848 to Congress an intention to leave a gaping hole in this carefully articulated structure which would permit SEPTA (at least with respect to operations where it owned the track and rolling stock and intended itself to operate the service) and other similarly situated commuter authorities to cause a massive displacement of Conrail employees.
There is an obvious appeal in SEPTA's basic position that if it is willing to take on the thankless job of furnishing commuter passenger rail service, it should be entitled to make a fresh start, with labor agreements negotiated in accordance with Pennsylvania's Public Employee Relations Act rather than being obliged to take, even if only as a point of reference, agreements with railway craft unions which are the successors of decade old agreements negotiated by Conrail's predecessors under the Railway Labor Act. Some of SEPTA's detailed arguments also have force, as our discussion has shown. Yet, when all this has been said, to uphold SEPTA's position would be to defy Justice Holmes' admonition in Johnson v. United States, 163 F. 30, 32 (1 Cir. 1908).
The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before.
It would surely have been possible for Congress to have expressed what we think to have been its intention far more clearly, as, to take one method out of many, by saying: "No commuter authority shall undertake commuter service which Conrail was rendering to it under contract on the effective date of this Act unless", etc. But laws enacted by Congress "are not to be read as though every i has to be dotted and every t crossed." United States ex. rel. Knauff v. Shaughnessy, 338 U.S. 537, 548-49, 70 S.Ct. 309, 315, 94 L.Ed. 317 (1950) (Frankfurter, J., dissenting). While "the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing ... it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary[,] but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Cabell v. Markham, 148 F.2d 737, 739 (2 Cir.) (L. Hand, J.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).
We have considered whether, despite all this, because of the substantial argument that the construction of the statute urged by RLEA and Conrail might cause it to be unconstitutional under National League of Cities, supra, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (although we decide that question also against SEPTA, see infra), we should adopt SEPTA's reading under the principle of construing an ambiguous statute to avoid constitutional doubts. See Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927) (Holmes, J., concurring); Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 346, 48 S.Ct. 194, 198, 72 L.Ed. 303 (1928); Ashwander v. TVA, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); Lucas v. Alexander, 279 U.S. 573, 577, 49 S.Ct. 426, 428, 73 L.Ed. 851 (1929); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). But in the end we are confident that the statute means what RLEA and Conrail say. Despite awkward draftsmanship and unexplained gaps, notably the possible one of the contracting out situation, Congress left no real doubt that a commuter authority which was employing Conrail to render commuter service on the effective date of Subtitle E could not operate that service on its own account or have Amtrak Commuter operate the service for it under adequate payment without propelling itself down the path described in §§ 508 and 510. Having firmly arrived at that conclusion we see no justification for giving the statute a different *849 interpretation in order to avoid a constitutional doubt which, although real, we consider ultimately to be unfounded.
It remains to consider the special problems of the Fox Chase-Newtown service. SEPTA argues that, whatever our conclusion on its broader plan may be, it had no obligation with respect to the Fox Chase-Newtown segment since this was not in operation on the effective date of the Act, August 13, 1981. RLEA answers that although the Operating Agreement between Conrail and SEPTA had expired on March 31, 1978, this was continued pending negotiations by § 7.03(d) and that, by virtue of Conrail's August 20 acceptance of SEPTA's offer of August 11, the agreement was extended until December 31, 1981. In their view it follows that when the Fox Chase-Newtown line was repaired, legal responsibility for resuming operation was in Conrail, not SEPTA.
What this argument overlooks is that, some months before the effective date of the Act, SEPTA had made clear to Conrail that it would not continue to subsidize RDC service. When the Fox Chase-Newtown service was closed down on July 1, 1981, this was therefore not an ordinary closing for repair. It was a closing with a definite understanding that when and if Conrail and SEPTA negotiated new terms, these would not include any SEPTA financing for RDC service or, in consequence, any obligation of Conrail to furnish it. On the effective date of NRSA, Conrail thus had not even a contingent responsibility for the Fox Chase-Newtown service. SEPTA thus did not violate § 508 or 510 in beginning service on its own account without going through the procedures required by those sections.

IV. Constitutionality

SEPTA contends that forcing it to comply with §§ 508 and 510 would contravene the principle announced in National League of Cities v. Usery, supra, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245. That case established that, despite the breadth of the commerce power,[22] there are limits to its exercise upon "the States as States." 426 U.S. at 845, 96 S.Ct. at 2471. The specific holding was that the 1974 amendment extending the Fair Labor Standards Act to any "public agency" was unconstitutional insofar as it operated "to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions". 426 U.S. at 852, 96 S.Ct. at 2474. At the same time the Court overruled Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), which had upheld the validity of an earlier amendment extending the Fair Labor Standards Act to employees of state hospitals, institutions and schools. Justice Blackmun, whose vote was necessary to make up the majority in National League of Cities, joined on the basis of an interpretation that the opinion "adopts a balancing approach, and does not outlaw federal power in areas such as environmental protection, where the federal interest is demonstrably greater and where state facility compliance with imposed federal standards would be essential", 426 U.S. at 856, 96 S.Ct. at 2476, see also 426 U.S. at 852-53, 96 S.Ct. at 2474-75 (majority opinion) (distinguishing wage freeze in Fry v. United States, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975), because of the emergency *850 threatening all component parts of the federal system and the minimal intrusion on state sovereignty).
In Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc., 452 U.S. 264, 101 S.Ct. 2352, 2365-66 & n.29, 69 L.Ed.2d 1 (1981), the Court revisited National League of Cities, saying that
in order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of National League of Cities must satisfy each of three requirements. First, there must be a showing that the challenged statute regulates the "States as States." Id. [426 U.S.], at 854 [96 S.Ct. at 2475]. Second, the federal regulation must address matters that are indisputably "attributes of state sovereignty." Id., at 854 [96 S.Ct. at 2475]. And third, it must be apparent that the States' compliance with the federal law would directly impair their ability "to structure integral operations in areas of traditional functions." Id., at 852 [96 S.Ct. at 2474].29
29 Demonstrating that these three requirements are met does not, however, guarantee that a Tenth Amendment challenge to congressional commerce power action will succeed. There are situations in which the nature of the federal interest advanced may be such that it justifies State submission. See Fry v. United States, 421 U.S. 542 [95 S.Ct. 1792, 44 L.Ed.2d 363] (1975), reaffirmed in National League of Cities v. Usery, supra, at 852-853 [96 S.Ct. at 2474-2475] (197[6]). See also id. at 856 [96 S.Ct. at 2476] (Blackmun, J., concurring). (Emphasis in original; parallel citations omitted.)
RLEA and the United States as amicus contend that the inapplicability of National League of Cities is conclusively established by Justice Rehnquist's statement, 426 U.S. at 854-55 & n.18, 96 S.Ct. at 2475-76 & n.18, that the holdingas opposed to certain languagein the opinion in United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936), as well as the holdings in California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957), and Parden v. Terminal Ry. of the Alabama State Docks Department, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), remained unaffected. The question cannot be so easily answered, for the facts of those cases differ significantly from those before us. Those cases upheld application of the Safety Appliance Act, the Railway Labor Act and the Federal Employers' Liability Act to state-owned and operated terminal railroads which interchanged with privately owned carriers freight traffic moving in interstate and foreign commerce. Although they operated wholly within the state, their activities were at the core of the commerce clausethe transportation of goods originating or terminating outside the state. While the railroads involved in the three cases were not intended to make a profit after debt service, they were likewise not intended to operate at a loss, nor was there anything to indicate they had done so. Even more important, while publicly owned freight terminal railroads were not at all unknown, most freight terminal railroads were privately owned and operated, see In the Matter of the Valuation Proceedings under Sections 303(c) and 306 of the Regional Rail Reorganization Act of 1973, Rail Use Opinion, Sp.Ct.Rep. N 38196, N 38399 & n.217 (1981). There was no evidence of the same general sense of state or local government responsibility for freight service, even within terminal areas, that has been developing with respect to urban passenger service within the last several years.
Against these cases, SEPTA relies heavily on United Transportation Union v. Long Island R.R. Co., 634 F.2d 19 (2 Cir. 1980), cert. granted, 452 U.S. 960, 101 S.Ct. 3107, 69 L.Ed.2d 970 (1981), in which the court held that application of the Railway Labor Act to the state-owned Long Island Rail Road in such a way as to dislodge New York's antistrike law for public employees violated National League of Cities. That case was, in one way, a weaker one for the application of the tenth amendment limitation than this case, for the Long Island was engaged in a limited freight business as well as its larger passenger operations. But in another respect, New York's interest in enforcement of its antistrike law may have been stronger than any of Pennsylvania's interests here, since the Pennsylvania *851 Public Employees Relations Act does not forbid a strike after prescribed procedures have been exhausted. Thus, the Long Island case presented an extremely close question, and we are hesitant to rely on it for guidance, particularly when there is an alternative ground for decision available.
SEPTA also relies on a number of other cases in lower federal courts, notably Amersbach v. City of Cleveland, 598 F.2d 1033 (6 Cir. 1979), which held the operation of a municipal airport to be a traditional and integral governmental function, and a number of district court decisions holding that under National League of Cities the Fair Labor Standards Act could not constitutionally be applied to local transit systems.[23] In each of these cases, the courts have struggled with the problem of applying the amorphous standards of "integral" and "traditional"  a problem that rivals the question encountered some decades ago in attempting to draw the line between governmental and proprietary activities of local governments for the purpose of determining the scope of sovereign immunity. Prosser, Law of Torts 479-82 (4th ed. 1971). These prior cases do not dictate a result in favor of either party.
We likewise do not find decisive the Government's argument that NRSA imposes a procedural regime on the state and does not displace the state's substantive decisions. The Supreme Court in National League of Cities did distinguish the imposition of a wage freeze on state employers, Fry v. United States, supra, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363, on the ground that it did not displace state decisions but only required the maintenance of state decisions for a limited time. 426 U.S. at 853, 96 S.Ct. at 2475. This case is clearly weaker than Fry for the application of that distinction, for SEPTA is not merely required to maintain its past decisions on employee relations; rather, it is required to adopt a new method of making decisions. We see some force to the contention that such a requirement entails a greater intrusion on state sovereignty than a wage freeze. Again, we think that the question is a close one and prefer to leave it, as well as the further definition of "integral" and "traditional", to the Supreme Court to decide in the Long Island case.[24]
We need not attempt to answer these questions, for this case is controlled by the important interests of the federal government that are at stake. See Hodel, supra, 101 S.Ct. at 2366 n.29, quoted at p. 850, supra. We are not dealing here with an across the board statute like the Fair Labor Standards Act in which the federal government's interest in wages and hours of state and local employees was simply the same interest that it had in regulating all other employees engaged in or producing goods for commerce. The instant controversy arises in the context of an intensive federal effort to preserve both passenger and freight rail transportation in the northeastern states and passenger service throughout the nation  an effort which has cost billions of dollars of federal funds and from which Pennsylvania has derived great benefits. The Government's interests in minimizing future costs for Conrail and itself and in seeking to preserve labor peace and employee morale clearly transcend Pennsylvania's interest in having SEPTA free from what is ultimately an arbitral process to determine how its initial employment complement should be set and from bargaining under the Railway Labor Act rather than Pennsylvania's Public Employees Law. We therefore reject SEPTA's contentions based on National League of Cities.[25]
*852 The parties shall endeavor to agree on a judgment granting and denying declaratory and injunctive relief in conformity with this opinion. The judgment shall not include any provision for costs. If they are unable to agree on a form of judgment within fourteen days from the filing of this opinion, judgment shall be settled on five days notice.
NOTES
[1] NRSA constituted Subtitle E of Title XI of the Omnibus Budget Reconciliation Act of 1981, P.L. 97-35, 95 Stat. 357. It was enacted and became effective August 13, 1981.
[2] Some of these commuter lines extended to New Jersey and Delaware. SEPTA proposes to discontinue service outside Pennsylvania.
[3] SEPTA's offer stated:

As you know, SEPTA also anticipates assuming direct responsibility for the Reading District on January 1, 1982. This is an extremely complex undertaking and SEPTA will need a substantial volume of information and assistance from Conrail over the next several months. Conrail's fulfillment of its stated intentions to cooperate fully in the transition effort is essential to our task.
[4] As developed at argument, the service which SEPTA operates between Fox Chase and Newtown and intends to operate out of the Reading Terminal is at no higher speed than that formerly operated. The "high speed" terminology is rather an expression of hope that different types of equipment and operations, made feasible in part by less burdensome labor agreements, might provide service at higher speed and lower costs.
[5] SEC. 509. FACTFINDING PANEL.

(a) Amtrak Commuter or a commuter authority and the representatives of the various classes and crafts of employees to be transferred to Amtrak Commuter or such commuter authority shall, by May 1, 1982, establish a factfinding panel, chaired by a neutral expert in industrial relations, for purposes of recommending changes in operating practices and procedures which would result in greater productivity to the maximum extent practicable.
(b) The National Mediation Board shall appoint public members to the panel established under subsection (a) of this section.
(c) The factfinding panel shall, by July 1, 1982, submit a report to the parties setting forth its recommendations for changes in operating practices and procedures.
(d) The factfinding panel may provide mediation, conciliation, and other assistance to the parties.
[6] By its terms § 510(a) is applicable only in instances in which § 508(a) has already operated.
[7] The increased cost arises because employees with seniority dates prior to the date of the respective agreements have the right to fill second brakemen positions that could otherwise be vacant so long as the alternative would be furlough.
[8] The New York Metropolitan Transportation Authority and the Connecticut Department of Transportation already own all the commuter route miles which they operate, and the New Jersey Transit Authority owns 384 miles out of 486 operated. Options for Conrail, Conrail's Response to Section 703(c) of the Staggers Rail Act of 1980, dated April 1, 1981, Table 9-2. According to the Stipulation of Facts, ¶¶ 20 and 23, SEPTA owns 130 route miles of the 246 over which Conrail had been providing passenger service, with Conrail owning only 15 and Amtrak 99. The figures in Table 9-2 are different, showing SEPTA as owning 158, Conrail 101 and Amtrak 78 route miles. We understand that most commuter authorities also own the rolling stock.
[9] For the sake of simplicity we shall generally refer to arguments as RLEA's although the same or similar arguments are made by Conrail.
[10] It should be noted that RLEA's argument lives and dies with § 508(a); there is no other provision in NRSA that supports a claim that SEPTA must negotiate regarding the transfer of Conrail employees. See note 6, supra.
[11] An answer might be that SEPTA would be required to negotiate if it wanted some Conrail employees. Yet a construction whereby the process of negotiation and arbitration which Congress thought desirable could be avoided by a commuter authority's taking the most extreme position and not otherwise is not persuasive.
[12] Our conclusion as to the limited effect of the "to be transferred" provision is somewhat reinforced by the provision in § 411 added to the RRRA with respect to freight employees by § 1146(a) of NRSA. Although this used the same "to be transferred" language as § 508 of the Rail Passenger Service Act, it manifestly is mandatory.
[13] SEPTA concedes that § 506(a), which provides that "Not later than April 1, 1982, each commuter authority shall notify Amtrak Commuter and Conrail whether it intends to operate its own commuter service or to contract with Amtrak Commuter for the operation of such service", is mandatory. Transcript of Oral Argument at 43. SEPTA argues, and we agree, that this provision does not say in so many words that if an authority elects the first option, it must accept the transfer of enough Conrail employees to man the service. However, given the similarities between the language of §§ 506(a) and 508(a), and the fact that the two sections were introduced into the statute at the same point in the legislative process, pp. 844-845, infra, it is difficult, as a matter of statutory construction, to see why § 506(a) should be construed to be mandatory and § 508(a) to be permissive.
[14] NRSA has a complicated history. The Act is based on S. 1100, introduced May 4, 1981 by Senator Packwood and referred to the Senate Committee on Commerce, Science, and Transportation, and on H.R. 3559, introduced May 12, 1981 by Representative Florio and referred to the House Committee on Energy and Commerce. Apparently neither bill was debated on the floor. Instead, their respective provisions were incorporated, with various changes, in the House and Senate Budget Reconciliation billsS. 1377 and H.R. 3982. Differences between these bills were resolved in conference, see Submission of Explanatory Statement of House and Senate Conferees With Respect to Subtitles E, F, and G of Title XI of the Omnibus Reconciliation Bill (H.R. 3982) Submitted by House Committee on Energy and Commerce and Senate Committee on Commerce, Science, and Transportation in Accordance With Section 1199A of H.R. 3982 (hereafter "Explanatory Statement"), reprinted in 127 Cong.Rec. H5956-5975 (August 4, 1981) and 127 Cong. Rec. S9056-9074 (July 31, 1981).
[15] There was no equivalent of the notification requirement of § 506(a) in the earliest versions of the act. The present § 506 is based on § 202 of the original Senate bill, S. 1100. Compare § 202(a), (b), (c) and (d) with § 506(b), (c), (d) and (e).

Similarly, neither the original House bill, H.R. 3559, nor the rail service provisions of the House version of the Omnibus Bill, H.R. 3982, contained an equivalent of § 506: the House bills apparently did not envision any direct transfer of Conrail properties to commuter authorities as distinguished from Amtrak Commuter. See H.R. 3559, § 202 (which would have added §§ 501-505 to the Rail Passenger Service Act).
[16] We also note that even under S. 1100, which would have provided SEPTA with an argument considerably more persuasive than the version finally passed, SEPTA's representatives indicated a belief that the labor provisions were mandatory. David F. Girard-diCarlo, SEPTA's Chairman, testified to a Senate subcommittee that:

There is one other issue that is of particular concern to SEPTA, and that is that we, with some minor adjustments to our service, could operate totally intrastate. If we did that and we took over the service, the employees would be public employees governed by act 195 of the Commonwealth of Pennsylvania.
I would suggest to you, Senators, that your legislation does not seem to provide us the mechanism to operate under local State law and that the present legislation indeed might be unconstitutionally in violation of the 10th amendment as an unlawful intrusion by the Federal Government on the sovereignty of the States.
Northeast Rail Service Act of 1981, Hearing Before the Subcommittee on Surface Transportation of the Senate Committee on Commerce, Science, and Transportation, 97th Cong., 1st Sess. 27 (June 17, 1981). On the same day that Mr. Girard-diCarlo testified, S. 1377 was introduced. The new bill deleted the language of S. 1100 that would have aided SEPTA's argument that the Act was permissive, and substituted what is now the mandatory phrasing of §§ 506(a) and 508(a), see supra.
[17] A similar result apparently would have obtained under the House bills, H.R. 3559 and H.R. 3964. Both bills ignored the possibility of transfers of labor or property to commuter authorities. H.R. 3559, § 401 (adding § 506 to the Rail Passenger Service Act); H.R. 3964, § 6461 (adding § 506 to the Rail Passenger Service Act), reprinted in 127 Cong.Rec. H3616 (June 26, 1981).
[18] SEPTA also suggests that RLEA's interpretation of § 508(a) leads to anomalous results. As noted above, NRSA specifically envisions that commuter authorities may contract with entities other than Amtrak Commuter for the provision of commuter services. See § 504(g); p. 843, supra. SEPTA argues that since a third party contract operator would have had no previous relations with Conrail, Congress could not reasonably have expected it to take over Conrail employees and that nothing in § 508 in terms requires such a contract operator to negotiate with Conrail labor representatives. At argument counsel for RLEA sought to counter this by pointing to the definition of "commuter authority" in § 1135(a) as including "any entity created by one or more such agencies for the purpose of operating, or contracting for the operation of commuter service," and arguing that this included third party contractors. Counsel for SEPTA effectively responded that this refers only to a subsidiary created by a commuter authority, not to an independent contractor engaged by an authority or the subsidiary.

Based on the above observation, SEPTA argues that if it wishes to operate its own commuter service it should stand in no worse position than a contractor whom it hires. We are not certain what the ultimate decision with respect to the independent contractor should be. On January 11, 1982, we denied, without prejudice to renewal, on the ground that the issue was not ripe for decision, a motion by RLEA to file a second amended complaint that would have raised that question. However, even if we assume arguendo that § 508(a) is not applicable to a contractor, at least when no transfer of Conrail property is required, Congress may have had reasons to treat commuter authorities that operate their own services differently from those that contract with third parties. The fact that Congress may have left an escape hatch in the contracting out situation, whether deliberately or through inadvertence, an issue we do not decide, does not prove that it meant to allow a larger one.
[19] The NECCRAC Report on Conrail Labor Issues, which was known to Congress, see Northeast Rail Service Act of 1981, Hearing Before the Subcommittee on Surface Transportation of the Senate Committee on Commerce, Science, and Transportation, 97th Cong., 1st Sess. 14, 76-92 (1981) (including reprint of NECCRAC report), devoted 15 pages, pp. 15-29, to demonstrating the adverse impact of outdated labor rules on productivity and costs. The report pointed to an analysis made by Conrail showing that annual savings from work rule changes proposed by NECCRAC would amount to $9.4 million for SEPTA, $19.9 million for New Jersey Transit, and $16.5 million for MTA-CDOT (p. 28). The report proposed that Congress should give the commuter authorities one of two alternatives, p. 35:

1. Give the individual commuter rail authorities the ability to operate the service directly under state labor laws.
2. Retain the National Railway Labor Act as the governing law, but amend it to:
a. require Conrail's successor and the labor organizations to renegotiate the current contract upon takeover; and
b. establish a final and binding process to resolve the long-festering issues relating to work rules and bases of pay.
Congress did neither.
[20] One can indeed think of reasons why a commuter authority might wish to negotiate an implementing agreement. Commuter authorities might have viewed labor transfer negotiations as a way to assure access to skilled Conrail commuter employees. See the testimony of Louis Gambaccini, Commissioner of Transportation for the State of New Jersey, before House Subcommittee on Commerce, Transportation, and Tourism, at pp. 35-37, and before the Senate Subcommittee on Surface Transportation of the Committee on Commerce, Science, and Transportation, 97th Cong., 1st Sess., at p. 108 (1981). However, under § 508 Conrail employees are not required to accept work with a commuter authority, see § 508(c)(3), and even those employees that do accept such employment will be permitted to return to Conrail with their previous seniority, see § 508(c)(7). Again § 506(g) provides that the transfer of "fixed facilities and rolling stock" from Conrail to commuter authorities under § 506 shall be without consideration. However, as explained at pp. 844-845, supra, and as conceded by SEPTA, Transcript of Oral Argument at 43-44, NRSA as enacted contains no linkage between its property and labor transfer provisions. Moreover, even if there was such linkage, it appears that commuter authorities already own much of the property needed to operate commuter service, see note 8, supra. Also the Secretary of Transportation probably would not allocate any of the $50,000,000 which § 601(b) of the Rail Passenger Service Act, added by § 1139 of NRSA, authorizes for appropriation "to facilitate the transfer of rail commuter services from Conrail to other operators" to a commuter authority which had not executed an implementing agreement. Without saying that these incentives might not operate in some cases, we think that in most they would not overcome the desire of commuter authorities to get away from the burden of taking on Conrail employees and their representatives if they were free to do so, see note 19, supra.
[21] The evil was lessened but not wholly eliminated by the provision that Conrail was entitled to furlough one employee for each employee exercising such rights.
[22] We do not understand SEPTA to claim that §§ 508 and 510 would lie beyond the commerce power even when SEPTA discontinues operations to New Jersey and Delaware. SEPTA's commuter services within Pennsylvania clearly affect commerce. We can take notice that these require fuel and other supplies coming from outside the state and that many of the commuters are employed by enterprises engaged in interstate or foreign commerce. See United States v. Darby, 312 U.S. 100, 113-18, 61 S.Ct. 451, 456-59, 85 L.Ed. 609 (1941); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Still more important, Subtitle E amends the Rail Passenger Service Act, the first in a series of measures enacted over the past 12 years, in which Congress has grappled with the overall problem of maintaining railroad service in the northeastern states and railroad passenger service generally; these statutes have drawn on both the bankruptcy and the commerce powers, see In re Penn Central Transportation Co., 180 Day Appeals, 384 F.Supp. 895, 915-16 (Sp.Ct. RRRA 1974).
[23] We were advised that in one of these, San Antonio Metropolitan Transit Authority v. Donovan, No. SA-79-CA-457 (W.D.Tex. Nov. 17, 1981), the Government has taken a direct appeal to the Supreme Court under 28 U.S.C. § 1252.
[24] The Long Island case will doubtless be decided before the end of the Supreme Court's current Term, and we stand ready to consider the National League of Cities question again if its opinion should give occasion for doing so.
[25] In the light of this disposition, we deny the January 13, 1982 "Motion of the United States as Amicus Curiae for Leave to File Supplemental Brief".