534 F.Supp. 852 (1982)
RAILWAY LABOR EXECUTIVES' ASSOCIATION, Plaintiff,
v.
SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Defendant,
and
Consolidated Rail Corporation, Rule 19 Party.
No. 82-5.
Special Court, Regional Rail Reorganization Act.
March 11, 1982.
William G. Mahoney, and Clinton J. Miller, III, Highsaw & Mahoney, P. C., Washington, D. C., for plaintiff Railway Labor Executives' Association.
John Markle, Jr., Robert H. Young, Jr., and Barbara Kritchevsky, Drinker, Biddle & Reath, Philadelphia, Pa., for defendant Southeastern Pennsylvania Transportation Authority.
Harry A. Rissetto, and John A. Fraser, III, Morgan Lewis & Bockius, Washington, D. C., and Hermon W. Wells, Philadelphia, Pa., for Rule 19 Party Consolidated Rail Corp.
Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.

*853 OPINION
FRIENDLY, Presiding Judge:
This case is a sequel to our decision in Railway Labor Executives' Ass'n v. Southeastern Pennsylvania Transportation Authority, 534 F.Supp. 832, hereafter SEPTA I. Familiarity with our opinion in that case will be assumed.
The complaint of Railway Labor Executives' Association (RLEA), dated February 10, 1981, predicating this Court's jurisdiction on § 1152(a) of the Northeast Rail Service Act of 1982 (NRSA), 95 Stat. 357, 676, originally contained two counts. In the first count, Southeastern Pennsylvania Transportation Authority (SEPTA) was named as defendant and Consolidated Rail Corporation (Conrail) as a Rule 19 party. The gravamen of the complaint lay in paragraph 18 which alleged that
18. In a letter dated February 3, 1982, Mr. David L. Gunn, Chief Operations Officer/General Manager of SEPTA, to Mr. R.B. Hoffman, Regional Manager  Passenger Services, Conrail, SEPTA informed Conrail that it intends to provide contract janatorial [sic] and grass cutting maintenance service to the 104 stations listed on Exhibit 1 to said letter on February 15, 1982, and thus would be performing work involving such janatorial [sic] and grass cutting now performed by Conrail, and which was being performed by Conrail in providing commuter services for SEPTA on the effective date of NERSA.
The complaint alleged that this conduct violated §§ 508 and 510 of the amendments to the Railroad Passenger Service Act (RPSA) made by § 1145 of NRSA and would result in irreparable loss of statutory rights of Conrail employees under NRSA and seniority rights under collective bargaining agreements. The second count, in which Conrail alone was named as defendant, alleged that compliance by Conrail with SEPTA's notice would place Conrail in violation of the Railway Labor Act. Subsequently RLEA stipulated to voluntary dismissal of the second count pursuant to F.R.Civ.P. 41(a)(1)(i). The complaint sought, inter alia, declaratory and injunctive relief against SEPTA's contracting out or assuming any work incident to commuter services that had been performed by Conrail employees without complying with §§ 508 and 510.
SEPTA's answer admitted the giving of the February 3 notice but contended that this was not in contravention of §§ 508 and 510. SEPTA further alleged that if NRSA made its conduct unlawful, this would violate the Tenth Amendment of the Constitution under National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).[1] The answer requested dismissal of the complaint, a declaration of SEPTA's right to subcontract services previously performed by Conrail without subjecting itself to §§ 508 and 510 of RPSA, and a further declaration that a commuter authority does not evidence an intent to operate commuter service when it retains an independent contractor to operate all or part of the service presently provided by Conrail or by using a contractor or its employees to perform something other than the actual operation of the trains used in commuter rail services.
An affidavit of Mathew E. Trzepacz attached to SEPTA's memorandum of February 12, 1982, opposing a temporary restraining order or a preliminary injunction, together with the Stipulation of Facts in SEPTA I, provides further factual background: Prior to April 1, 1976, SEPTA subsidized commuter rail service on 13 lines radiating from center city Philadelphia operated by the Pennsylvania Railroad (subsequently Penn Central) and the Reading and later by their respective reorganization trustees. Since April 1, 1976, SEPTA has subsidized the operation of such service by Conrail pursuant to § 304 of the Regional Rail Reorganization Act of 1973, as amended. Currently these operations are conducted under an agreement dated May 28, 1981. *854 This has been extended to March 31, 1982, and a further extension to June 30, 1982 is contemplated. Paragraph 2(f) of the agreement provides:
(f) Conrail grants SEPTA the right to approve all cost and budgetary assumptions, including manpower levels, used in the budgeting process, except labor costs governed by safety considerations, statutes, agency rules or regulations, work rules and labor contracts. The preceding sentence is intended to increase and not to reduce SEPTA's control over the costs of the Service, and shall not be construed as a limitation upon any rights which SEPTA may have by statute or otherwise to control such costs. In the event that, during the budgetary negotiation process, the parties cannot agree on mutually acceptable staffing requirements, service standards and associated costs thereof for a particular type of activity involved in providing the Service, or in the event that Conrail is unable to provide any such work activity at a level acceptable to SEPTA with respect to cost and/or staffing levels, SEPTA shall be entitled to exercise, without limitation, the rights which it has under the Operating Agreement to assume responsibility for providing such activity on its own or by contracting with one or more other parties. Upon the exercise of such right by SEPTA, the Operating Agreement shall be adjusted accordingly. SEPTA shall pay Conrail any reasonable transition costs related to such a transfer of responsibility, excluding "Title V" protection costs and liabilities, and shall be responsible for any "Section 13(c)" protection claims arising out of any agreements executed by SEPTA. (Emphasis added.)
SEPTA owns the 104 stations on the former Pennsylvania and Reading lines listed in Mr. Gunn's letter of February 3, 1982. Janitorial and grass-cutting service at these stations had been performed by Conrail employees. According to Mr. Gunn's letter, the staffs of SEPTA and Conrail had been engaged since early January 1981 in discussing "ways for SEPTA to reduce operating expenses and increase the quality of commuter rail services if SEPTA were to assume responsibility for performing certain work presently contracted from Conrail under the Operating Agreement. One of the services identified by Conrail's staff in conjunction with our Fiscal Year 1982 Offer of Subsidy was the maintenance on SEPTA owned stations. Your [i.e., Conrail's] staff recommended that SEPTA take over this maintenance effort and supplied estimates of cost attendant with this aspect of your operation."[2]
In March, 1981 SEPTA began to prepare bid documents, specifications and contracts for the performance of janitorial and grass-cutting at the 104 stations. In November 1981 SEPTA mailed and published invitations for bids. Two bids were received. Fernandez Associates Incorporated (Fernandez) was the low bidder. Pursuant to approval by its board of directors on December 16, 1981, SEPTA entered into a one-year contract with Fernandez for the janitorial and grass-cutting work on January 25, 1982. On February 1, 1982, SEPTA issued to Fernandez a notice to proceed. SEPTA anticipates annual savings from this arrangement with Fernandez of $300,000 a year.
Prior to appearing before Judge Thomsen of this court on February 12, 1982, for a hearing on RLEA's application for a temporary restraining order, counsel reached an agreement as follows: SEPTA undertook to refrain from having Fernandez begin services under its contract with SEPTA until we had ruled upon the issues raised in RLEA's complaint. RLEA agreed to request *855 the dismissal without prejudice of its motions for a temporary restraining order and preliminary injunction. The parties agreed to submit briefs by February 19, 1982, and requested that we decide the issues presented as expeditiously as possible, without reply briefs or oral argument. Judge Thomsen approved this agreement after a hearing on the record wherein the parties agreed to the factual correctness of the submissions that had been made. Subsequently we requested further briefs, due not later than March 2, 1982, on the possible bearing of the Norris-LaGaurdia Act, 29 U.S.C. § 101 et seq., and permitted the parties to include in such briefs material in the nature of replies to the briefs submitted on February 19. We stated our understanding to be that the cause was submitted for decision on RLEA's request for a permanent injunction and declaratory relief and what we deemed to be SEPTA's motion for dismissal under F.R.Civ.P. 12(b)(6), including the last sentence of Rule 12(b). None of the parties has indicated a contrary view.[3] In light of our determination on the merits it has become unnecessary for us to consider the application of the Norris-LaGuardia Act.
We held in SEPTA I that SEPTA itself could not lawfully take over the entire operation of commuter service on a line previously operated under contract by Conrail without complying with the procedures of §§ 508 and 510. The parties believe that this case raises only the question left open by footnote 18 to that opinion.[4] We do not. The question rather is whether §§ 508 and 510 of RPSA are applicable in a situation where a commuter authority seeks to complete the process of making a small-scale adjustment in the manner in which commuter service is provided when substantial steps towards making this adjustment had been taken prior to the effective date of NRSA.
As was true in SEPTA I, much can be said on either side, and it seems a bit peculiar *856 that we should again have to engage in the difficult task of trying to decipher what Congress meant in an obscurely worded statute when it is still meeting in the same session. RLEA argues that the overarching intent of Congress was to minimize displacement of Conrail employees who had been engaged in rendering commuter service subsidized by commuter authorities, both for their own sakes and because of the adverse effect upon Conrail of their exercise of seniority rights, see SEPTA I, pp. 840-841. Hence, in its view, the statute prohibits a commuter authority, as of the date of enactment, from exercising a contract right to direct that a portion of the service theretofore provided by Conrail be performed instead by a subcontractor. SEPTA responds that it has an immediate interest in cutting the costs of the janitorial and grass-cutting service before Conrail ceases to provide service on December 31, 1982; that §§ 508 and 510 are inapplicable to a commuter authority's decision to operate commuter service through an independent contractor; and that, in any event, nothing in the amendments to RPSA prevents it from engaging a subcontractor to perform part of the service for sound economic reasons, even though this has the effect of paring down the number of Conrail employees engaged in operating commuter service at the time when negotiations must commence.
We begin our discussion with the observation that neither the language of § 508(a) nor the statutory definition of "commuter service"[5] is of much guidance. Likewise, we find none of the various references to the contracting out situation that the parties have gleaned from other sections of the statute particularly useful.[6] Accordingly, we look to the purposes underlying NRSA's labor transfer provisions as a basis for decision. The labor transfer provisions were an attempt to deal with the disruptions thought likely to accompany the large-scale transfer of commuter services from Conrail to other entities. Section 508 was designed to ensure "an orderly transfer" of Conrail's commuter service employees to other entities, Submission of Explanatory Statement of House and Senate Conferees on Omnibus Reconciliation Act of 1981 at 58, and to minimize the adverse effects of the transition on Conrail.
From this perspective, we accept, at least arguendo, that as a general proposition, § 508(a)'s phrase "commuter authorities that intend to operate commuter service" must be read to include commuter authorities that propose to transfer the operation of such service to a subcontractor. We say this because the disorder and adverse effects on Conrail would be of precisely the same character and magnitude whether a commuter authority operates its own service or makes use of an independent contractor to do so. Since Congress intended to prevent the harm in one situation we see no reason why it would not have done so in the other. Moreover, § 508(a)'s requirement regarding the direct operation of commuter service by a commuter authority would serve little purpose if it could be put at naught by use of an independent contractor.
Even assuming the foregoing, SEPTA's actions in the present case do not fall within the statute's terms. As noted above, NRSA's labor transfer provisions were designed *857 to deal with a particular event  the transfer of Conrail's commuter operations to other entities. The perceived danger that this entailed was the massive dislocation of Conrail employees and the consequent disruption of Conrail's workforce. In the present case SEPTA is contracting for only a small part of the commuter service operations in the Philadelphia area, and the effect on Conrail will be minimal. Far more important, there are overwhelmingly reliable indications that SEPTA is not attempting to accomplish by degrees that which we think it may not do all at once. These indications are the discussions between SEPTA and Conrail in early January of 1981 regarding the desirability of contracting out for janitorial and grass-cutting services and the preparation of bid specifications and so forth by SEPTA in the spring of 1981  all well before NRSA was enacted. These events are important to our conclusion in two separate respects.
First, they bear on whether SEPTA's conduct is within the range of actions by commuter authorities that § 508 was intended to regulate. As noted above, NRSA's labor transfer provisions were meant to deal with an unusual event, namely, the large-scale transfer of commuter operations from Conrail to other entities. Plainly, that is not the situation in this case. The pre-NRSA conduct of SEPTA and Conrail indicates that contracting out for janitorial and grass-cutting services was merely one of the routine changes in the manner in which commuter service is provided to Philadelphia of the type those entities frequently had made. Moreover, it does not pose the danger to Conrail that inheres in the transfer of entire commuter service operations. If Conrail was satisfied that SEPTA's contracting out for janitorial and grass-cutting services would not adversely affect it, we do not think Congress would have perceived that such changes posed a threat to Conrail. In short, the character of the change in service sought by SEPTA and the pre-NRSA recommendations, discussions, and preparatory work indicate that the situation we face is not what concerned Congress when it enacted § 508.
The pre-NRSA actions of SEPTA and Conrail are important for another reason, namely, their bearing on SEPTA's intent, an issue that § 508(a), which predicates the labor transfer negotiating process on a commuter authority's "inten[t]" to operate commuter service, requires us to consider. Here, the pre-NRSA actions of SEPTA and Conrail clearly indicate that SEPTA is not attempting to circumvent the provisions of NRSA; rather, it is merely carrying out plans, approved by Conrail, that have been underway since before NRSA's enactment. To repeat the point made earlier, what SEPTA intends by the arrangement with Fernandez is not to "operate commuter service" but to continue its historic pattern of making minor adjustments in the way commuter service is provided in Philadelphia.
We need not decide precisely what factual showing by a commuter authority will satisfy the foregoing interpretation of § 508. This case involves very clear evidence of SEPTA's intent merely to make small-scale adjustments, consistent with historic practices, in the way commuter service is provided in Philadelphia, rather than to engage in the type of transfer envisioned by § 508. We will decide subcontract cases lacking evidence of pre-NRSA preparations and consent by Conrail or involving more substantial portions of Conrail's commuter operations, see footnote 3 supra, when and if they arise.
Judgment will be entered dismissing the complaint.
NOTES
[1] We certified to the Attorney General, pursuant to 28 U.S.C. § 2403(a), that the constitutionality of an Act of Congress had been drawn into question. The United States has not sought to intervene, evidently believing that its views were sufficiently set forth in SEPTA I.
[2] Mr. Gunn's letter also stated:

It should also be noted that by exercising our right under the May 28 Agreement, SEPTA will see an improvement to the physical condition of SEPTA's stations. Over the past several years, various citations by the local municipalities have been issued against SEPTA as the owner of certain rail stations. These citations were caused in part by the failure of Conrail forces and subcontract forces of Conrail to properly implement grass cutting and janitorial services at these stations.
[3] In its February 19 brief SEPTA stated:

SEPTA also intends to contract for the design and implementation of an accounting system to be used when Conrail ceases to operate commuter service. SEPTA plans to contract out the repair of rolling stock and it also contemplates using its own security forces to provide security at Suburban Station, Reading Terminal and Wayne Junction. Some of the work SEPTA plans to contract out is work presently contracted out by Conrail; for example, maintenance of the catenary system and certain heavy car repairs.
We decide only the case before us, namely, the proposed subcontract with Fernandez for janitorial and grass-cutting services at the 104 stations.
[4] The footnote reads in its entirety:

SEPTA also suggests that RLEA's interpretation of § 508(a) leads to anomalous results. As noted above, NRSA specifically envisions that commuter authorities may contract with entities other than Amtrak Commuter for the provision of commuter services. See § 504(g); p. 21, supra. SEPTA argues that since a third party contract operator would have had no previous relations with Conrail, Congress could not reasonably have expected it to take over Conrail employees and that nothing in § 508 in terms requires such a contract operator to negotiate with Conrail labor representatives. At argument counsel for RLEA sought to counter this by pointing to the definition of "commuter authority" in § 1135(a) as including "any entity created by one or more such agencies for the purpose of operating, or contracting for the operating of commuter service," and arguing that this includes third party contractors. Counsel for SEPTA effectively responded that this refers only to a subsidiary created by a commuter authority, not to an independent contractor engaged by an authority of the subsidiary.
Based on the above observation, SEPTA argues that if it wishes to operate its own commuter service it should stand in no worse position than a contractor whom it hires. We are not certain what the ultimate decision with respect to the independent contractor should be. On January 11, 1982, we denied, without prejudice to renewal, on the ground that the issue was not ripe for decision, a motion by RLEA to file a second amended complaint that would have raised that question. However, even if we assume arguendo that § 508(a) is not applicable to a contractor, at least when no transfer of Conrail property is required, Congress may have had reasons to treat commuter authorities that operate their own services differently from those that contract with third parties. The fact that Congress may have left an escape hatch in the contracting out situation, whether deliberately or through inadvertence, as issue we do not decide, does not prove that it meant to allow a larger one.
[5] "Commuter service" means short-haul rail passenger service operated in metropolitan and suburban areas, whether within or across the geographical boundaries of a State, usually characterized by reduced fare, multiple-ride, and commutation tickets, and by morning and evening peak period operations....
[6] Pointing to the fact that § 503(a)(1) of RPSA as amended by § 1137 of NRSA authorized Amtrak Commuter to "own, manage, operate or contract for the operation of commuter service", RLEA argues that Congress could not have intended Amtrak Commuter to be free of the requirements of §§ 508 and 510 if it contracted for the operation of service even in part and that the result must be the same for a commuter authority. The conclusion does not follow even if we accept the premise. Amtrak Commuter would be starting from scratch whereas a commuter authority would be taking over only such services as Conrail was supplying. Section 508(b) does not contain the limiting language "that intend to operate commuter service" which is found in § 508(a).