539 F.Supp. 1222 (1982)
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 732, IBT, Plaintiffs,
v.
SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, and Consolidated Rail Corporation, Defendants.
Civ. A. No. 82-14.
Special Court, Regional Rail Reorganization Act.
May 21, 1982.
*1223 Herbert K. Lippman, New York City, for Intern. Broth. of Teamsters, Local 732, IBT.
Lewis H. Van Dusen, Jr., John Markle, Jr., and Robert H. Young, Jr., Philadelphia, Pa. (Drinker Biddle & Reath, Philadelphia, Pa.), for Southeastern Pennsylvania Transp. Authority.
Hermon M. Wells, Philadelphia, Pa., for Consol. Rail Corp.
Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.
FRIENDLY, Presiding Judge:
This action is the third in which we have been required by § 1152(a) of the Northeast Rail Service Act of 1981 (NRSA), 95 Stat. 357, 676, to consider the application of §§ 506, 508 and 510 of the Rail Passenger Service Act, added by § 1145 of NRSA, to acts taken or proposed to be taken by Southeastern Pennsylvania Transportation Authority (SEPTA) concerning the commuter service in the southeastern Pennsylvania region being supplied to it by Conrail under contract.[1] The two previous cases are Railway Labor Executives' Ass'n v. SEPTA, (SEPTA I), 534 F.Supp. 832 (January 27, 1982), and Railway Labor Executives' Ass'n v. SEPTA, (SEPTA II), 534 F.Supp. 852 (March 11, 1982). Familiarity with these opinions is assumed.
Plaintiff Local 732 of the International Brotherhood of Teamsters (IBT) is the representative of railroad police and security officers employed by Conrail. The identity of defendants SEPTA and Conrail and the relations between them are described in our opinion in SEPTA I, supra, 534 F.Supp. at 834-35, and need not be repeated here.
The issue in Count I of the complaint, as now refined by the parties' stipulation of facts,[2] is as follows: On March 29, 1982, SEPTA notified Amtrak Commuter Services Corporation (Amtrak Commuter) pursuant to § 506(a) of its intention to contract with Amtrak Commuter for the operation of commuter rail service in the southeastern Pennsylvania region.[3] On the same date SEPTA notified Conrail that, pursuant to §§ 2(f) and 4.05(b) of the contract between them,[4] SEPTA intended to provide with its own employees security at the Suburban Station, Reading Terminal, Wayne Junction and North Broad Street stations in Philadelphia, beginning on May 1, 1982.[5] The complaint alleged that this would result in the irreparable loss of the rights of the Conrail employees who had been performing these services. Count II of the complaint, apparently alleged only against Conrail, asserted that for Conrail to permit displacement of police officers who are members of Local 732 without an implementing agreement under § 508 of NRSA would violate the Railway Labor Act. Plaintiff sought a temporary restraining order, a preliminary and a final injunction, and declaratory relief.
A hearing on plaintiff's motion for a temporary restraining order was had before the writer on May 3, 1982. The motion was denied and a hearing on the application for a preliminary injunction was set for May 20. The parties were directed to make all reasonable efforts to stipulate the facts and *1224 were advised that at the May 20 hearing the court might order the trial of the action on the merits to be advanced and consolidated with the hearing on the application for a preliminary injunction pursuant to F.R.Civ.P. 65(a). Since examination of the stipulation of facts and other papers, see note 2, supra, disclosed there were no significant disputed issues of fact, we followed that course.
Only a few additional facts need be stated. SEPTA's letter of March 29, 1982, to Conrail, announcing its decision to take over security functions at the four stations, said that Conrail's staff "had suggested to SEPTA, in January, 1981, and again in June of that year that SEPTA assume responsibility for security." The evidence supports this statement. Affidavit of Thomas P. Smith ¶¶ 2, 3; Affidavit of William W. Bouffard ¶¶ 6-11, 13. In fact the subject had been a bone of contention since 1980, with SEPTA being dissatisfied with the security service being furnished by Conrail and Conrail complaining that SEPTA had not provided funds for a sufficient number of officers. SEPTA began interviewing for policemen to replace Conrail police prior to the enactment of NRSA in August, 1981, made final selections in October, 1981, and began training the selected applicants at Temple University in November, 1981. In June, 1981, in connection with the negotiation of the existing contracts, Conrail submitted estimates to SEPTA which suggested the elimination of provision for security at an estimated reduction in payments to Conrail of $800,000 per year. The record does not describe how much of this would be consumed by payments to SEPTA employees.
This brief recital makes it apparent that this case is exceedingly close to SEPTA II. The considerations set forth there, 534 F.Supp. at 855-57, must govern our decision here. We said there that NRSA's "labor transfer provisions were an attempt to deal with the disruptions thought likely to accompany the large-scale transfer of commuter services from Conrail to other entities", 534 F.Supp. at 856, and that § 508 was "designed to ensure `an orderly transfer' of Conrail's commuter service employees to other entities" in order to "minimize the adverse effects of the transition on Conrail," id. In determining whether SEPTA's decision to subcontract for the provision of janitorial and grass cutting services without complying with § 508's procedures violated NRSA, we gave weight to steps taken prior to the passage of NRSA by SEPTA and Conrail which indicated that SEPTA's action "was merely one of the routine changes in the manner in which commuter service is provided to Philadelphia of the type those entities frequently had made." 534 F.Supp. at 857. We reasoned that these pre-NRSA actions, as well as the small number of employees affected and the peripheral character of their activities, indicated that the case did not involve the "unusual event" toward which NRSA was directed  the "large-scale transfer of commuter services from Conrail to other entities", id.  and that the proposed change posed little threat to Conrail's operations. In addition, we noted that the pre-NRSA preparations suggested that SEPTA was not seeking to circumvent the statute by accomplishing by degrees what it could not do all at once.
The principal distinction suggested by plaintiff at the May 3 hearing was that the proposal in SEPTA II involved SEPTA's contracting out the grass cutting and janitorial service whereas here SEPTA plans to furnish the security service with its own employees. However, as we indicated in SEPTA II, supra, 534 F.Supp. at 856, this is a distinction without a difference. In their second set of briefs plaintiffs and Conrail place greater weight on the point that the preparations undertaken by SEPTA prior to the enactment of NRSA in this case were less substantial than those in SEPTA II. We think, however, that the discussions occurring in the spring and early summer of 1981 between SEPTA and Conrail, Conrail's own pre-NRSA suggestion that security was a service that it would make sense for SEPTA to provide directly, and SEPTA's interviewing of job applicants prior to August of 1981 satisfy the standards articulated *1225 in SEPTA II. These actions, like the pre-NRSA actions in SEPTA II, negate the inference that SEPTA's intent is to circumvent NRSA's labor transfer provisions. Together with the small number of employees involved, these pre-NRSA actions strongly suggest that whatever harm Conrail and its employees may suffer is not comparable to the large-scale disruptions that the wholesale transfer of commuter operations was thought to entail. Instead, these preparations, although not so extensive as those in SEPTA II, nonetheless indicate that the change was merely part of the "historic pattern of making minor adjustments in the way commuter service is provided in Philadelphia," 534 F.Supp. at 857, which we do not think Congress meant to prohibit when it enacted NRSA.[6]
SEPTA now advances an argument not previously available to it. This is that in view of its March 29, 1982, notice to Amtrak Commuter it no longer has any obligations to negotiate under § 508(a) or to bargain under § 510(a)(1).[7] Since we consider SEPTA II to be decisive against Count I of the complaint in any event, we need not and do not here pass upon this thorny argument.
Count II of the complaint raises an issue beyond our jurisdiction. See § 1152(a).
An order will be entered denying the application for a preliminary injunction, and dismissing Count I of the complaint on the merits and Count II for lack of jurisdiction.
NOTES
[1] The currently effective contract, dated May 28, 1981, has been extended to June 30, 1982. We have been advised that a further, and final, extension to December 31, 1982, is contemplated.
[2] The stipulation is supplemented by the lengthy Stipulation of Facts, the Appendix thereto, and the Supplemental Stipulation of Facts filed in SEPTA I.
[3] This represented a reversal of SEPTA's previous intention to operate these services on its own account. See SEPTA I, supra, 534 F.Supp. at 835.
[4] Section 2(f) is quoted in SEPTA II, supra, 534 F.Supp. at 854.
[5] An earlier letter, dated February 3, 1982, from SEPTA to Conrail had advised Conrail of SEPTA's intention to provide security services directly as of February 15, 1982, but shortly before that date SEPTA postponed implementation of its decision.
[6] Plaintiffs and Conrail also argue that because security affects passengers in a more "vital manner", Conrail Br. at 10, than grass-cutting this case is distinguishable from SEPTA II. This distinction finds no support in the legislative intent underlying NRSA, which was concerned with the disruptive effect of transfers on Conrail, and we reject it.
[7] Railway Labor Executives' Association has sought and we have granted leave to file an amicus brief addressed solely to this argument.