547 F.Supp. 884 (1982)
RAILWAY LABOR EXECUTIVES' ASSOCIATION, Plaintiff,
v.
SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Defendant,
and
Consolidated Rail Corporation, and Amtrak Commuter Services Corporation d/b/a Commuter Services Corporation, Rule 19 Parties.
No. 82-18.
Special Court, Regional Rail Reorganization Act.
September 23, 1982.
Certiorari Denied December 13, 1982.
*885 Clinton J. Miller, III, and John J. Sullivan, Washington, D. C. (Highsaw & Mahoney, P. C., Washington, D. C.), for plaintiff Railway Labor Executives' Ass'n.
Lewis H. Van Dusen, Jr., and Robert H. Young, Jr., Philadelphia, Pa. (Drinker Biddle & Reath, Philadelphia, Pa.), for defendant Southeastern Pennsylvania Transp. Authority.
Harry A. Rissetto, and John A. Fraser, III, Washington, D. C. (Morgan Lewis & Bockius, Washington, D. C.), and Hermon M. Wells, Philadelphia, Pa. (Consolidated Rail Corp., Philadelphia, Pa.), for Rule 19 Party Consol. Rail Corp.
Seymour Kurland, and Mark L. Alderman, Philadelphia, Pa. (Wolf, Block, Schou, & Solis-Cohen, Philadelphia, Pa.), for Rule 19 Party Amtrak Commuter Services Corp.
Certiorari Denied December 13, 1982. See 103 S.Ct. 571.
WEINER, Judge:

I.
This is the fourth in a series of cases involving application of §§ 508 and 510 of the Rail Passenger Service Act (RPSA) added by § 1145 of the Northeast Rail Service Act of 1981 (NRSA) to actions taken or proposed to be taken by Southeastern Pennsylvania Transportation Authority (SEPTA) concerning commuter rail service in the southeastern Pennsylvania region. That commuter rail service is currently being supplied to SEPTA by Consolidated Rail Corporation (Conrail) on a contractual basis pursuant to § 304 of the Regional Rail Reorganization Act of 1973 (RRRA). The three previous cases are Railway Labor Executives' Association v. Southeastern Pennsylvania Transportation Authority (SEPTA I), 534 F.Supp. 832 (D.D.C.1982), cert. denied ___ U.S. ___, 102 S.Ct. 2271, 73 L.Ed.2d 1285 (1982), Railway Labor Executives' Association v. Southeastern Pennsylvania Transportation Authority (SEPTA II), 534 F.Supp. 852 (March 11, 1982), and International Brotherhood of Teamsters v. Southeastern Pennsylvania Transportation Authority (SEPTA III), 539 F.Supp. 1222 (1982). Since we must apply those precedents to the case now before us, familiarity *886 with those opinions is necessary and will be assumed.
The identity of plaintiff Railway Labor Executives' Association (RLEA), defendants SEPTA and Conrail and the relations between them have been fully described in Presiding Judge Friendly's opinion in SEPTA I, supra, 534 F.Supp. at 834-35. A new party, Amtrak Commuter Services Corporation, (Commuter) which does business as Commuter Services Corporation has been named as a Rule 19 party in the complaint.[1] Commuter was established by § 501 of RPSA, as added by § 1137 of NRSA, to operate commuter service on behalf of those commuter authorities which contract with it to provide such service. Commuter's involvement in this action stems from SEPTA's March 29, 1982, notification to Commuter and Conrail that pursuant to § 506(a) of RPSA, as added by § 1137 of NRSA, it intends to contract with Commuter for the operation of commuter rail service in the southeastern Pennsylvania region.[2]
In this case, as in each of the three previous cases, the complaint alleges that SEPTA's acts or proposed acts violate §§ 508 and 510 and will result in irreparable loss of the rights of Conrail employees under NRSA. The particular act which plaintiff complains of is SEPTA's announced intention to assume performing through a contractor the ticket selling functions currently being provided by Conrail and Conrail employees represented by the Brotherhood of Railway, Airline and Steamship Clerks, a constituent member of RLEA.[3]
The complaint further alleges that the selling of tickets constitutes "commuter service" as defined in § 1135(a)(4) of NRSA. The relief prayed for is a declaration that SEPTA or Commuter pursuant to § 508 must negotiate and arbitrate, if necessary, an implementing agreement with Conrail and the labor organizations representing the employees performing the ticket selling function prior to SEPTA's or Commuter's operation of "commuter service" and a similar declaration with respect to the § 510 collective bargaining negotiations along with injunctive relief prohibiting SEPTA from contracting out the ticket selling function without first complying with §§ 508 and 510.[4] *887
*888 SEPTA's answer asserts that its assumption of the ticket selling function falls within the exceptions outlined in SEPTA II and SEPTA III, and further, that it is not governed by §§ 508 and 510 because it has served notice that it intends to contract with Commuter for the operation of its commuter rail lines and it is not a commuter authority that intends to operate commuter service within the meaning of that term in §§ 508(a) and 510(a)(1).
Procedurally this matter is before us on RLEA's motion for a preliminary injunction which was filed on June 15, 1982. That motion requested that the Court establish a schedule for filing of a stipulation of facts and briefs and for hearing oral argument. We did so in an order dated June 17, 1982. The parties filed their stipulation of facts on June 28, 1982.[5] All pertinent facts were not agreed to, however, and Conrail requested that the Court schedule an evidentiary hearing before the writer. That hearing was held on July 1, 1982. SEPTA and Conrail have also filed certain affidavits to complete the evidentiary record. At oral argument on July 16, 1982, the Court informed the parties that in accordance with Rule 65(a)(1) F.R.Civ.P., trial on the merits would be advanced and consolidated with the hearing on the motion for preliminary injunction.

II
The background of Conrail's operation of commuter service for SEPTA has been set forth in the Court's opinions in SEPTA I, 534 F.Supp. 834-35, and SEPTA II, 534 F.Supp. at 853-54. The factual background giving rise to this action began when SEPTA identified certain areas it wished to remove from subsidy operation by Conrail; among those areas was the elimination of ticket selling by Conrail. At the evidentiary hearing David L. Gunn, Chief Operations Officer and General Manager of SEPTA, testified that in November, 1980 he met with Richard Sullivan, Conrail's Vice-President of Passenger Service, and discussed ways for SEPTA to cut costs and thereby reduce its subsidy to Conrail. Included in those discussions was a general reference to SEPTA's assuming responsibility or subcontracting for the performance of various functions. On January 30, 1981, another meeting was held between representatives of Conrail and SEPTA to discuss means by which SEPTA could reduce costs. Mr. Gunn's notes of that meeting list five functions which he mentioned to Conrail that SEPTA could take over. These functions were: station cleaning, car cleaning, ticket selling, security, and operation of the Newtown-Fox Chase line. A Conrail witness at the hearing, Donald A. Brinkworth, did not dispute that these functions were discussed, but he maintained that the discussions were very general and Conrail had not agreed at those meetings to a takeover of the ticket selling function by SEPTA. On June 3, 1981, another meeting was held to find ways to reduce costs. At that meeting Conrail proposed that $1.5 million could be *889 saved by a major elimination of ticket selling.
Sometime during June, George W. Miller, Treasurer of SEPTA, directed a member of his staff, Barbara Titus, to begin developing plans for the contracting out of the ticket selling functions. A draft request for proposal for the services of a consultant was prepared on June 15, 1981. Subsequently Mrs. Titus spoke to Conrail representatives and requested information regarding ticket selling in the Reading Division.[6] At about the same time SEPTA began plans to assume operating responsibility for the Reading Division. That operation was scheduled to commence on January 1, 1982.[7] Conrail interpreted Mrs. Titus' requests for information as relating to the larger takeover of rail operations on the Reading Division rather than relating to a more limited takeover of ticket sales.
In any event, SEPTA continued its efforts to prepare for the contracting out of ticket sales. In December, 1981 SEPTA advertised a notice for a request for proposal by contractors. Since February, 1982 SEPTA has engaged in negotiations with one contractor, Blue Ribbon Services, Inc., which has submitted a proposal. This preparation led to SEPTA's April 12, 1982 notification to Conrail that it intended to perform the ticket sales function on the Reading Division on August 1, 1982, and to assume responsibility for the balance of the ticket sales at a later date.
If SEPTA proceeds with this plan, Conrail will abolish 56 positions on the Reading Division and 76 positions on the former Penn Central lines. In all 139 Conrail employees will be affected and 132 positions will be eliminated.

III
We must now decide whether this case should be governed by the holding in SEPTA I or whether it fits within the exceptions outlined in the decisions in SEPTA II and SEPTA III. After an exhaustive examination of the RPSA amendments and their legislative history, Judge Friendly held in SEPTA I that SEPTA could not lawfully assume operation of commuter service on a line previously operated by Conrail without complying with the procedures of §§ 508 and 510.
When presented with SEPTA's attempt to subcontract for the station cleaning function in SEPTA II, the Court framed the issue as
whether §§ 508 and 510 of RPSA are applicable in a situation where a commuter authority seeks to complete the process of making a small-scale adjustment in the manner in which commuter service is provided when substantial steps towards making this adjustment had been taken prior to the effective date of NRSA. 534 F.Supp. at 855.
In deciding that issue the Court looked to the purposes underlying NRSA's labor transfer amendments to RPSA. Judge Friendly found "[t]he labor transfer provisions were an attempt to deal with the disruptions thought likely to accompany the large scale transfer of commuter services from Conrail to other entities". 534 F.Supp. at 856. The disruptive effect on Conrail of SEPTA's contracting out of the performance of janitorial and grass-cutting services was considered minimal.[8]
The Court considered at some length and gave weight to steps taken prior to the passage of NRSA by SEPTA and Conrail. These pre-NRSA preparations indicated that SEPTA's decision to subcontract for the performance of janitorial and grass-cutting services "was merely one of the routine changes in the manner in which commuter *890 service is provided to Philadelphia of the type those entities frequently had made." 534 F.Supp. at 857. The pre-NRSA discussions and preparations were important for two reasons. "First, they bear on whether SEPTA's conduct is within the range of actions by commuter authorities that § 508 was intended to regulate." Id. Second, the pre-NRSA actions of SEPTA and Conrail bear on the question of whether SEPTA intends to operate commuter service, either itself or through a subcontractor. Application of the §§ 508 and 510 provisions is predicated on such an intent to operate commuter service. In SEPTA II the Court found the pre-NRSA preparations suggested that SEPTA was not seeking to circumvent the statute by accomplishing by degrees what the decision in SEPTA I prohibited it from doing all at once. The Court did not decide what factual showing by a commuter authority would satisfy the SEPTA II exception. It did, however, state "[w]e will decide subcontract cases lacking evidence of pre-NRSA preparations and consent by Conrail or involving more substantial portions of Conrail's commuter operations ... when and if they arise". Id. Such questions have come before the Court in SEPTA III and now in this action.
The Court found SEPTA III "exceedingly close to SEPTA II", 539 F.Supp. 1224. Although SEPTA's pre-NRSA preparations for performing security service with its own employees were not as substantial as those demonstrated in SEPTA II, the Court found that they did satisfy the standards articulated in the prior case. Taken together with the small number of employees involved[9] the pre-NRSA preparations indicated to the Court that SEPTA's proposed "change was merely part of the `historic pattern of making minor adjustments in the way commuter service is provided in Philadelphia', 534 F.Supp. at 857, which we do not think Congress meant to prohibit when it enacted NRSA." 537 F.Supp. at 1225.
From the brief factual recital in part II of this opinion, it is apparent that the facts of this case are not as close to SEPTA II as Judge Friendly found the facts of SEPTA III to be. Both sides ask us to evaluate the pre-NRSA discussions and preparations in the light of the standards developed in SEPTA II. Conrail asserts, and RLEA agrees, that those standards have not been met because the pre-NRSA discussions were too general and tentative to demonstrate that Conrail did approve an assumption by SEPTA of the ticket selling function prior to the effective date of NRSA. SEPTA asserts that such approval should be inferred from the various meetings where the subject of reduction of costs through the elimination of Conrail's performance of various functions was discussed. From the evidence presented and testimony heard it does not appear to us that the evidence supports a finding that Conrail approved SEPTA's takeover of the ticket selling function. What is clear to us is that SEPTA formed an intent in January, 1981 to assume the ticket selling function at some future date, and it appears that Conrail first fully appreciated SEPTA's intention to take over the ticket selling function in the summer of 1981, when the discussions were being held regarding SEPTA's takeover of the operation of the entire Reading Division.
We are not convinced, however, that approval by Conrail is a prerequisite for application of the SEPTA II standards. The consent of Conrail to SEPTA's takeover of the station cleaning and security service in SEPTA II and SEPTA III, merely buttressed the otherwise available evidence that such changes in service were those contemplated and permitted by paragraph 2(f) of the May 28, 1981 agreement between SEPTA and Conrail.[10] SEPTA's making *891 any change permitted by ¶ 2(f) is not contingent on approval by Conrail. Prior to August 13, 1981, the effective date of NRSA, the relations between SEPTA and Conrail were governed solely by § 304 of RRRA and the various agreements between them.
We must now face the question of whether the pre-NRSA discussions and preparations are sufficient to meet the test articulated in SEPTA II. We find that they are. The evidence presented to us indicates that the pre-NRSA discussions between SEPTA and Conrail were no more or no less concrete with regard to the ticket selling function than those same discussions were with regard to the janitorial and grass-cutting and security functions. The uncontroverted evidence shows that these three functions along with car cleaning and operation of the Newtown-Fox Chase Line were generally discussed in both January and June of 1981. These discussions along with the pre-NRSA preparations by SEPTA were held sufficient in SEPTA II and SEPTA III and we think they are sufficient here as well. SEPTA's pre-NRSA preparations, while not very extensive, do demonstrate that the ground work had begun to contract out the ticket selling function in June and July of 1981. They also demonstrate that SEPTA's intent was to change its relationship with Conrail in a manner which it thought consistent with the May 28, 1981 Agreement between it and Conrail. We find no evidence to suggest that SEPTA's takeover of responsibility for ticket selling through a subcontractor would have been contrary to ¶ 2(f) of the agreement.
That does not, however, end our inquiry. In both SEPTA II and SEPTA III the Court characterized the change sought by SEPTA as fitting into the "historic pattern of making minor adjustments in the way commuter service is provided in Philadelphia." 534 F.Supp. at 857. We must address the question of the magnitude of the change sought by SEPTA. If SEPTA completes its proposal to take over the ticket selling function, 132 positions will be abolished by Conrail. These 132 positions are approximately eight percent of a total workforce of 1709 employed by Conrail for its SEPTA operations, as contrasted with the comparatively small number of Conrail positions eliminated after SEPTA's changes permitted by the decisions in SEPTA II (32), and SEPTA III (14). While the number of employees adversely affected alone should not be determinative, the disruptive effect on Conrail's operations in some ways is proportional to the number of employees displaced. The impact on Conrail's remaining workforce and its labor protection obligations imposed by Title VII of RRRA are dependent on the number of employees displaced. We nevertheless find that SEPTA's proposed takeover is merely one of the small scale adjustments made in the way commuter service is historically provided for Philadelphia. The transfer of the ticket selling functions from Conrail to SEPTA may be characterized as routine and minor, and although involving a larger number of positions, is not substantially dissimilar to the changes approved in SEPTA II and SEPTA III. The magnitude of this proposed action by SEPTA is not so great that *892 it stretches SEPTA II beyond its permissible limits and invokes the prohibition of SEPTA I.[11]
As in SEPTA III we need not decide the question whether SEPTA retains any obligation to negotiate under § 508(a) or to bargain under § 510(a)(1) in view of its March 29, 1982, notice to Commuter since we consider SEPTA II to be dispositive of this case.
Judgment will be entered denying the motion for a preliminary injunction and dismissing the complaint on the merits.
NOTES
[1] Rule 19 of the Federal Rules of Civil Procedure provides for "joinder of persons needed for just adjudication."
[2] By letter of David F. Girard-diCarlo, Chairman of The Board of SEPTA, to David W. Marston, President and Chairman of the Board of Amtrak Commuter Services Corporation, dated March 29, 1982, SEPTA served notice on Commuter that SEPTA intends to contract with Commuter for the operation of commuter rail services in accordance with § 506(a) of RPSA.
[3] In his letter of April 12, 1982, David L. Gunn, Chief Operations Officer/General Manager of SEPTA advised Conrail that effective August 1, 1982, SEPTA intended to begin performing by contractor ticket sales functions currently provided by Conrail and Conrail employees. Exhibit B to the complaint. The August 1, 1982, date for takeover of the ticket selling function was subsequently changed. A letter from David L. Gunn to R. P. Huffman, Conrail's Regional Manager Passenger Services for the SEPTA Region, dated July 19, 1982, requested that Conrail continue its ticket selling activities until September 1, 1982. In a letter of August 24, 1982, John A. Fraser, counsel for Conrail, informed the Court that takeover of the ticket selling function by SEPTA had been further delayed to October 1, 1982.
[4] The full text of §§ 508 and 510 is as follows:

SEC. 508. TRANSFER OF EMPLOYEES.
(a) Not later than May 1, 1982, Conrail, commuter authorities that intend to operate commuter service, and representatives of the various crafts or classes of employees of Conrail to be transferred to the commuter authorities shall enter into negotiations for an implementing agreement in accordance with subsection (c) of this section.
(b) Not later than May 1, 1982, Conrail, Amtrak Commuter, and representatives of the various crafts or classes of employees of Conrail to be transferred to Amtrak Commuter shall enter into negotiations for an implementing agreement in accordance with subsection (c) of this section.
(c) Such negotiations shall 
(1) determine the number of employees to be transferred to Amtrak Commuter or a commuter authority;
(2) identify the specific employees of Conrail to whom Amtrak Commuter or a commuter authority offers employment;
(3) determine the procedure by which such employees may elect to accept employment with Amtrak Commuter or a commuter authority;
(4) determine the procedure for acceptance of such employees into employment with Amtrak Commuter or a commuter authority;
(5) determine the procedure for determining the seniority of such employees in their respective crafts or classes in Amtrak Commuter or with a commuter authority which shall, to the extent possible, preserve their prior seniority rights;
(6) ensure that all such employees are transferred to Amtrak Commuter or a commuter authority no later than January 1, 1983; and
(7) ensure the retention of prior seniority on Conrail of employees transferring to Amtrak Commuter or a commuter authority and determine the extent and manner in which such employees shall be permitted to exercise such seniority in order to (A) provide employees transferred to Amtrak Commuter or a commuter authority at least one opportunity every six-month period to exercise previous freight seniority rights, (B) maximize employment opportunities for employees on furlough, (C) maintain the ability to recall experienced employees, (D) ensure that under no circumstances are seniority rights exercised in any manner which results in any disruption of service or a position being filled which would otherwise not be filled under the terms of any crew consist, fireman manning, or other similar agreement, and (E) ensure that Conrail has the right to furlough one employee in the same craft or class for each employee who returns from Amtrak Commuter or a commuter authority by exercising seniority.
(d)(1) If agreements with respect to the matters being negotiated pursuant to this section are not reached by August 1, 1982, the parties to the negotiations shall, within an additional 5 days, select a neutral referee. If the parties are unable to agree upon the selection of such a referee, the National Mediation Board shall immediately appoint a referee.
(2) The referee shall commence hearings on the matters being negotiated pursuant to this section not later than 5 days after the date he is selected or appointed, and shall render a decision within 20 days after the date of commencement of such hearings. All parties may participate in the hearings, but the referee shall have the only vote.
(3) The referee shall resolve and decide all matters in dispute with respect to the negotiation of the implementing agreement or agreements. The referee's decision shall be final and binding to the same extent as an award of an adjustment board under section 3 of the Railway Labor Act, and shall constitute the implementing agreement or agreements between the parties. The National Mediation Board shall fix and pay the compensation of such referees.
(e) If Amtrak Commuter transfers commuter service and properties to a commuter authority under section 506 of this title, Amtrak Commuter, the commuter authority, and representatives of the various crafts or classes of employees to be transferred to the commuter authority shall enter into an implementing agreement in accordance with subsection (c) of this section. If no agreement is reached by the date service and properties are transferred, the dispute shall be resolved by a neutral referee in accordance with subsection (d) of this section.
(f) Any employee of Conrail who is not offered employment with Amtrak Commuter or a commuter authority under agreements entered into under this section shall be provided employee protection under section 701 of the Regional Rail Reorganization Act of 1973 to the same extent as if such employee had remained in the employ of Conrail.
SEC. 510. COLLECTIVE BARGAINING AGREEMENT FOR AMTRAK COMMUTER OR COMMUTER AUTHORITIES.
(a)(1) Not later than September 1, 1982, the commuter authorities that intend to operate commuter service and the representatives of the various classes or crafts of employees to be transferred to such commuter authorities under agreements entered into under section 508 of this Act shall enter into new collective bargaining agreements with respect to rates of pay, rules, and working conditions.
(2) Not later than September 1, 1982, Amtrak Commuter and the representatives of the various classes or crafts of employees to be transferred to Amtrak Commuter under agreements entered into under section 508 of this Act shall enter into new collective bargaining agreements with respect to rates of pay, rules, and working conditions.
(b) If the parties have not reached an agreement by the date specified in subsection (a) of this section, any party to the dispute or the Governor of any State through which the service that is the subject of the dispute is operated may, within 15 days after such date, request the President to establish an emergency board pursuant to subsection (c) of this section.
(c) Within 15 days after the request under subsection (b) of this section, of a party or a Governor, the President shall create an emergency board. Such board shall conduct a public hearing on the dispute at which each party shall appear and provide testimony, and shall, within 30 days after the date of its creation, report on the dispute.
(d) If no settlement in the dispute is reached within 10 days after the report of the emergency board, such board shall require the parties to the dispute to submit, within 5 days, final offers to the board for settlement of the dispute.
(e) Within 15 days after the submission of final offers, the emergency board shall submit a report to the President setting forth its selection of the most reasonable offer.
(f) If the emergency board selects a final offer submitted by a carrier and the employees of such carrier engage in any work stoppage arising out of the dispute, such employees shall not be eligible during the period of such work stoppage for benefits under the Railroad Unemployment Insurance Act.
(g) If the emergency board selects a final offer submitted by the employees and the carrier refuses to accept such offer, the carrier shall not participate in any benefits of any agreement between carriers which is designed to provide benefits to such carriers during a work stoppage.
(h) The provisions set forth in this section shall be the exclusive means for resolving any dispute relating to entering into an initial collective bargaining agreement between Amtrak Commuter or a commuter authority, as the case may be, and representatives of the various classes or crafts of employees to be transferred to Amtrak Commuter or such commuter authority.
[5] The stipulation of facts prepared for this case has been supplemented by incorporation of the Stipulation of Facts, Appendix to Stipulation of Facts and Supplemental Stipulation filed in SEPTA I, and the Stipulation of Facts filed in SEPTA III.
[6] Conrail's commuter operations in Philadelphia were divided into the Reading Division for lines running out of Reading Terminal which were formerly operated by the Reading Railroad and the Philadelphia Division for lines formerly operated by Penn Central.
[7] Letter of David L. Gunn to Richard C. Sullivan dated August 11, 1981. Conrail Exhibit 4 attached to the transcript of the July 1, 1982 evidentiary hearing.
[8] Thirty-two full time Conrail employees were affected by SEPTA actions in SEPTA II. Affidavit of Richard Sullivan ¶ 5, filed in SEPTA II.
[9] The positions of fourteen Conrail policemen were at stake in SEPTA III. SEPTA III, Stipulation of facts, ¶¶ 15-16.
[10] Paragraph 2(f) provides as follows:

(f) Conrail grants SEPTA the right to approve all cost and budgetary assumptions, including manpower levels, used in the budgeting process, except labor costs governed by safety considerations, statutes, agency rules or regulations, work rules and labor contracts. The preceding sentence is intended to increase and not to reduce SEPTA's control over the costs of the Service, and shall not be construed as a limitation upon any rights which SEPTA may have by statute or otherwise to control such costs. In the event that, during the budgetary negotiation process, the parties cannot agree on mutually acceptable staffing requirements, service standards and associated costs thereof for a particular type of activity involved in providing the Service, or in the event that Conrail is unable to provide any such work activity at a level acceptable to SEPTA with respect to cost and/or staffing levels, SEPTA shall be entitled to exercise, without limitation, the rights which it has under the Operating Agreement to assume responsibility for providing such activity on its own or by contracting with one or more other parties. Upon the exercise of such right by SEPTA, the Operating Agreement shall be adjusted accordingly. SEPTA shall pay Conrail any reasonable transition costs related to such a transfer of responsibility, excluding "Title V" protection costs and liabilities, and shall be responsible for any "Section 13(c)" protection claims arising out of any agreements executed by SEPTA.
[11] With regard to the particular and distinct aspect of its operations, SEPTA seeks to do no more than was attempted in the actions which precipitated SEPTA II and SEPTA III. The common element in each instance is the relative insignificance of the proposed change when viewed against the background of SEPTA's overall commuter service operation. When seen in that context it becomes evident that the way in which commuter service is provided in Philadelphia will not be altered to any appreciable degree by this change in the ticket selling functions.